ARMED SERVICES BOARD OF CONTRACT APPEALS

| | |
|---|---|
| Appeals of -- ) | |
| ) | |
| GSC Construction, Inc. ) | ASBCA Nos. 59402, 59601 |
| ) | |
| Under Contract No. W9126G-11-D-0061 ) | |

APPEARANCES FOR THE APPELLANT:     Karl Dix, Jr., Esq.
                                   Lochlin B. Samples, Esq.
                                   Douglas L. Tabeling, Esq.
                                     Smith, Currie & Hancock LLP
                                     Atlanta, GA

APPEARANCES FOR THE GOVERNMENT:    Michael P. Goodman, Esq.
                                     Engineer Chief Trial Attorney
                                   Stephanie R. Darr, Esq.
                                   Lauren M. Williams, Esq.
                                   Keith J. Klein, Esq.
                                     Engineer Trial Attorneys
                                     U.S. Army Engineer District, Tulsa

OPINION BY ADMINISTRATIVE JUDGE O'CONNELL

These appeals arise from a construction project at Fort Sill, Oklahoma. Appellant, GSC Construction, Inc. (GSC), challenges the contracting officer's default termination of the contract. It contends it is entitled to time extensions and reversal of the default termination, as well as additional money. The challenge to the default termination is before the Board in ASBCA No. 59402 and the delay claims in ASBCA No. 59601.

The Board conducted a 10-day hearing in Atlanta, GA, at which Judge McIlmail presided. The Board denies the appeals. In accordance with the Board's internal operating procedures, neither this opinion nor the concurrence in result has precedential value except for those portions of the opinion in which we all explicitly agree.

FINDINGS OF FACTS

1. The above referenced contract is a multiple award task order contract (MATOC) for various types of warehouses in areas west of the Mississippi River, awarded by the U.S. Army Corps of Engineers (Corps) on September 15, 2011 (R4, tab 28n at 1889-91). The MATOC contained various clauses, including Federal Acquisition Regulation (FAR) 52.249-10, DEFAULT (FIXED-PRICE CONSTRUCTION) (APR 1984) and FAR 52.236-21, SPECIFICATIONS AND DRAWINGS FOR CONSTRUCTION (FEB 1997) (R4, tab 28n at 1897-98).

2. The dispute arises from MATOC task order DS01 awarded on July 13, 2012, which required GSC to design and build two supply support activity (SSA) warehouses (referred to as the 100th and the 168th warehouses) and two associated bulk storage buildings (the SSA Warehouse project) (R4, tab 9a at 1, 6, 8-12, tab 9g at 1808).

3. The task order required completion of the project within 495 days of the September 26, 2012, notice to proceed, or by February 3, 2014 (R4, tab 9a at 698; tab 10). It is undisputed that GSC did not complete the work by that date (Jt. Stip. ¶ 14).

4. Contracting Officer (CO) Charles Peterson issued a show cause notice on January 16, 2014, in which he contended, among other things that GSC was 145 days behind its schedule and stated that he was considering termination of the contract for default (R4, tab 8). GSC, through its president, Locke McKnight, responded on January 28, 2014, citing various delays that he contended were not GSC's fault totaling 156 days, but stating that he was "confident" it could complete the project by June 9, 2014 (R4, tab 7 at 1-4).

5. A different contracting officer, Nathan Kloeckler, responded on February 24, 2014, advising GSC that it needed to submit formally the delays cited in its January 28 letter as requests for equitable adjustments (REAs) (meaning, presumably, that GSC needed to submit an REA if it wanted him to extend the contract completion date). CO Kloeckler further stated that he would not terminate the contract for default at that time due to GSC's commitment to complete the contract by June 9, 2014, but that the Corps was not waiving the contract completion date. (R4, tab 6)

6. CO Kloeckler issued a second show cause notice on April 28, 2014, contending that GSC had not made satisfactory progress towards a June 9, 2014 completion date and that he was again contemplating termination. He once again stated that the Corps did not "condone any delinquency" or "waive any rights" it had under the contract. (R4, tab 5)

7. GSC's project manager, Brannon Cundey, responded by letter dated May 5, 2014, again citing various delays that it contended were beyond its control, but now

stating that "GSC firmly believes" that it could complete the work by August 30, 2014 (R4, tab 4 at 1-3).

8.  CO Kloeckler terminated the contract for default on June 18, 2014, for failure to meet the contract completion date of February 3, 2014, and failing to make sufficient progress on completion of the work since that date[1] (R4, tab 3).  He testified credibly that the termination was based upon his independent decision and analysis (tr. 2/282, 3/9-12).  GSC filed a timely appeal on July 7, 2014 that the Board docketed as ASBCA No. 59402.

9.  The parties disagree on how much additional time GSC would have required beyond June 18, 2014.  The Corps contends that GSC had completed less than 50% of the work as of the termination and, based on its pace of work, would have needed until August 2015 to complete the project (ex. G-12 at 31).  GSC contends that as a result of the various delays it was entitled to a time extension, and the project would have finished no earlier than December 21, 2014 (app. br. at 38; tr. 10/134).

10.  In its post-hearing briefs, GSC focuses on three delays that, in its view, entitled it to time extensions, $328,293.82 in damages, and conversion of the termination for default to one for the convenience of the government (app. br. at 2; app. resp. br. at 2).  These delays are:  1) building pad delays; 2) fire water flow test; and 3) cold formed metal framing/design basis threat.  It also alleges delays due to design revision 3/additional site electric power, damage to roof panels, and the correction of errors in hairpin reinforcing bars (we address the latter two issues in the good faith and fair dealing section below).

11.  GSC contends that it is entitled to 321 days of excusable delays, including 258 compensable days due to the three main delays (app. br. at 38).  Its expert calculated that it is entitled to 165 days excusable/160 days compensable delay for the building pads; 22 days of excusable and compensable delay for the fire water flow test; and 134 days of excusable delay and 76 days of compensable delay for the cold formed metal framing[2] (ex. A-115).

---

[1] CO Kloeckler also wrote a termination memorandum dated June 17, 2014, in which he discussed his consideration of the factors in FAR 49.402-3(f) (R4, tab 135; tr. 3/9-12).

[2] GSC's expert contends that these were the controlling delays and that they overlapped with other, non-controlling delays, including design revision 3/additional site power and hairpins (*see*, *e.g.*, tr. 7/95-96, 105; ex. A-115).

*The Building Pad Delays*

12. The SSA Warehouse project site was in a corner of what was referred to as the TEMF [tactical equipment maintenance facility] Complex site, a project that included demolition of buildings on the SSA Warehouse site; infrastructure work; and the construction of a TEMF building, unmanned aerial vehicle storage buildings, and oil storage buildings (R4, tab 9c at 832; tr. 1/73-74; ex. A-18 at 1). The Corps awarded the TEMF Complex work to Harper Construction, Inc. (Harper or the "Infrastructure Contractor") (ex. A-18).

13. As we will illustrate, the work on the two projects required some coordination, and the dispute boils down to whether GSC or Harper was responsible for removing and replacing unsuitable soil on the SSA building sites (gov't resp. br. at 4-5; app. br. at proposed finding of fact (PFF) 17).

14. The SSA Warehouse task order had various provisions that delineated the responsibilities of GSC and Harper, including, for example, a provision that Harper would complete its work on the building pad sites within 120 days of the notice to proceed (R4, tab 9a at 698).

15. The task order statement of work (SOW) disclosed the presence of expansive (clay) soils at Fort Sill and specified that the foundation of the buildings must be designed to meet the geotechnical considerations of the site (R4, tab 9a at 21 (SOW 3.5.5) at 56 (SOW 6.2.1); tr. 1/71). While the Corps had provided a geotechnical report to offerors with the solicitation, the task order required GSC to perform a geotechnical investigation and to submit a report with its first foundation design submittal (R4, tab 9a at 40 (SOW 5.2.2)).

16. SOW 6.3, Site Planning and Design, at 6.3.1.1, provided that the Corps (that is, Harper, after it demolished the existing structures (tr. 9/193)) would "provide general site preparation and mass grading" that included brush clearing and removal of rocks, as well as:

> (c) Rough grading to plus or minus 0.3 feet of proposed subgrade elevation . . . for proposed structures. Maximum allowable variation of the finished floor elevations is plus or minus 0.2 feet. The Contractor is responsible for any additional fill or cut in order to meet the required minimum or maximum finished floor.

> (d) The Infrastructure Contractor will perform rough grading. In areas that required fill during the rough grading, general compaction of fills between 95 to 100

4

percent of density as measured by Standard Proctor with fill being constructed in maximum 8-inch lifts.

(R4, tab 9a at 56)

17. In addition, this clause identified the following requirements

for GSC:

(e) The Contractor is responsible for any specific site preparation required to accommodate the foundation design prepared or proposed by the Contractor.

6.3.1.2. Time and weather conditions may affect the actual condition of the building site(s); therefore, the Contractor shall accept the site(s) as is and be solely responsible for all final site preparation including any excavation (if necessary), placement of select fill (if necessary), and any testing required to accommodate the proposed foundation, as required by the Contractor's final geotechnical report.

(R4, tab 9a at 56)

18. Drawing C101, Note 1, provided:

TEMF INFRASTRUCTURE CONTRACTOR SHALL ROUGH GRADE SITE TO BOTTOM OF BASE LAYER FOR BUILDING SLAB AREA. . . . TEMF INFRASTRUCTURE CONTRACTOR GRADING WORK SHALL BE DONE TO ACCOMMODATE 8" BUILDING SLAB AND 6" AGGREGATE BASE . . . . DESIGN/BUILD CONTRACTOR TO PROVIDE FOUNDATIONS, SUBBASE, BASE AND BUILDING FLOOR SLABS AS REQUIRED BY THEIR DESIGN AND COORDINATE THICKNESS WITH GRADING WORK BY TEMF INFRASTRUCTURE CONTRACTOR.

(R4, tab 9c at 839) (emphasis added) The Board finds that "Design/Build Contractor" on this drawing refers to GSC.

19. Similarly, Drawing C203, Note 1, also provided that GSC was responsible for the foundations, base, subbase, and building floor slabs (R4, tab 9c at 844).

5

20. SOW 6.6 is entitled "Structural Design." At sub-section 6.6.3.1, it specified that due to soil conditions at Fort Sill, the contractor must use a pier and supported grade beam foundation with structurally supported slab, a conventional rib mat slab, or a thickened structural slab. (R4, tab 9a at 64-65)

21. Pier and supported grade beam foundations are common at Fort Sill. Selection of this foundation would have allowed GSC to leave the expansive soil in place. (Tr. 1/72, 3/273) Selection of a rib mat slab (or "waffle mat"), on the other hand, required the removal of the expansive soil and replacement with what the parties refer to as inert or select fill (tr. 3/113, 241, 4/81, 5/116, 7/80, 9/206). The inert material would form the subbase for the buildings (tr. 3/256; *see* findings 18-19).

22. In its proposal, GSC indicated that it intended to install a waffle mat slab and that it understood it would have to remove the existing soil and replace with select fill:

> **Foundations**:
>
> . . . the following was determined to be the most cost effective solution with the assumptions based on the local construction practices for these soil conditions and the building type:
>
> • Remove and replace a minimum of 8 feet and up to 9 feet of the unsuitable fill for an area including a 5 ft apron around the foot print and replace it with select structural fill. . . .
>
> • Foundation is to be a Concrete Waffle Mat supported on new structural fill . . . .

(R4, tab 9i at 1854)

23. GSC's proposal was incorporated in the contract (R4, tab 9b at 730, tab 28e at 441, tab 28n at 1920).

24. The SSA Warehouse solicitation, at appendix MM, attached at least part of the TEMF Complex specifications. However, they were marked 'PROVIDED FOR INFORMATION ONLY – NOT IN CONTRACT." (R4, tab 9d at 853) Appendix MM included the TEMF contract Earthwork section, which included the following language:

6

3.2.1 Building Slab

Overexcavate 8 feet below existing grade of existing soil and replace with inert fill as required by the geotechnical investigation. Extend limits of removal to at least 5 feet beyond the building footprint. Only imported inert fill or nonexpansive on site soils shall be used for building slab fill.

(*Id.* at 974, 981)

25. CO Kloeckler testified that the Corps provided the TEMF specifications in the SSA Warehouse solicitation because the contractors had to coordinate their work on the projects and that GSC had to tie in some of its work with Harper's work, including fire and domestic water lines, paving, and site lighting (tr. 3/15-16). To facilitate this process, the Corps conducted regular coordination meetings between GSC and Harper (R4, tab 140; tr. 2/180, 3/96).

26. On September 28, 2012, (two days after the notice to proceed) Mr. Cundey, GSC's project manager, wrote to government officials, including administrative contracting officer (ACO) Robert Owens, attaching a letter from GSC's structural engineer. Mr. Cundey stated that the information from GSC's structural engineer would provide the Infrastructure Contractor the depth of cut and fill (R4, tab 12 at 3-4).

27. ACO Owens responded by email later that afternoon, stating that he was "slightly confused with your needs." He stated that the Infrastructure Contractor would not provide any select fill and that "[i]f your foundation design requires any special fill [you] must excavate and re-fill at your cost IAW subparagraph [6.3.1.1] (e)" of the SOW. He further stated that the Corps' intent was for the Infrastructure Contractor "to provide you with a pad at the two elevations noted [in SOW 6.3.1.1(c)] but not with anything other than local soil." (R4, tab 12 at 1)

28. Mr. Cundey replied by email on October 9, 2012. Among other things, he acknowledged ACO Owens' reference to SOW 6.3.1.1(e) but stated that this provision required GSC to perform "site preparation," not mass grading, which, he contended were "completely separate entities." Mr. Cundey stated that site preparation referred only to any additional cut around the building pads. He further stated that site preparation "does not refer to the responsibility of removing soil and replacing soils." (R4, tab 13 at 1)

29. As referenced earlier, and contrary to Mr. Cundey's assertion, SOW 6.3.1.2 provided that GSC was "solely responsible for all final site preparation including any

excavation (if necessary), [and] placement of select fill (if necessary) . . . ." (R4, tab 9a at 56).

30. Soon after Mr. Cundey's October 9 email, ACO Owens spoke with Mr. Cundey. As a result of this conversation, he believed that Mr. Cundey had agreed that GSC would remove and replace the unsuitable soil from the site (tr. 3/100-01, 9/197-98). To confirm this understanding, ACO Owens wrote another email to Mr. Cundey on October 10, 2012, in which he stated: "[i]f we are still at a point that I need to send you a formal letter please let me know." (R4, tab 16 at 1) GSC did not respond to the email[3] (tr. 9/197).

31. Sometime in March 2013, a GSC official told ACO Owens that it did not intend to perform the excavation work at the building pad sites (tr. 9/197). As a result, on April 15, 2013, he formally directed GSC to begin the work (R4, tab 19).

32. GSC thereafter began excavating the unsuitable material but it encountered a problem at the 168th Warehouse site. When it had excavated down to where it should have been able to place the inert fill, it encountered what ACO Owens described as "blackish soil, very wet, heavy" (tr. 3/113). Mr. Cundey wrote to CO Charles Peterson and ACO Owens on July 10, 2013. He contended that there was a differing site condition, and proposed to remedy it by cutting one additional foot and placing one foot of stone to bridge the bad soil. He requested a 30-day time extension and $89,410. (R4, tab 177 at 1273-74)

33. ACO Owens agreed that there was a differing site condition. However, he viewed GSC's proposal as "very excessive." (Tr. 3/114) The Infrastructure Contractor, Harper, already had experience with the site conditions and had the equipment to address them. It proposed to remove more soil than GSC, place one foot of rock, and three feet of inert material, to be accomplished in four days for approximately $55,000. Because this was significantly less time and money than GSC sought, contained a more comprehensive fix, and because GSC was behind schedule and the work needed to be done quickly, ACO Owens assigned the work to Harper. (Tr. 3/114-15, 3/240-41)

---

[3] On February 18, 2013, GSC submitted a claim for $212,580 to perform the building pad work. GSC did not certify the claim. (R4, tab 2 at 1-3) After CO Kloeckler denied the claim, GSC filed an appeal docketed as ASBCA No. 59401, but the Board dismissed it due to the absence of a certification. *GSC Constr., Inc.*, ASBCA No. 59401, 15-1 BCA ¶ 35,887. GSC states that ASBCA No. 59401 involved the cost of performing the additional work whereas the cost of the delay is now before the Board in ASBCA No. 59601 (app. PFF 41).

8

34. GSC contends that it did not have access to the 168th Warehouse site from its discovery of the differing site condition on July 1, 2013, until July 25, 2013. GSC also contends that it encountered other differing site conditions including an asbestos pipe and trash and debris in the building pad area but it does not quantify the delay caused by these conditions, if any. (App. br. at PFF 39)

35. Based on an analysis by its expert, GSC seeks 165 days of excusable delay due to the alleged change in the building pad work, 160 of which it contends are compensable (app. br. at 34 (citing ex. A-115)).

36. The government has submitted convincing evidence that the late completion of the building pads was largely, if not entirely, GSC's fault by virtue of its failure to conduct a timely geotechnical investigation and in delaying its submittal of the final design of the project. GSC could have begun its geotechnical investigation once the government issued the notice to proceed on September 26, 2012, but it waited until October 30, 2012, to order its geotechnical subcontractor to begin work (R4, tab 37b at 5).

37. GSC needed this report before it could begin designing the slabs and foundations (tr. 8/44, 8/172; R4, tab 9a at 86-87) but the subcontractor proceeded slowly. Mr. Cundey expressed his concern on November 27, 2012, when he wrote to the subcontractor: "[w]e need the final report ASAP. . . . I have to get my structural engineer working on the foundations and desperately need your help in getting at least another preliminary recommendations [sic] on the heave potential and undercut/select fill." (R4, tab 177 at 223-24)

38. GSC did not obtain the geotechnical report and submit it to the Corps until January 22, 2013; the Corps rejected it for failing to meet the requirements of the contract on February 4, 2013 (R4, tab 37b at 1). GSC resubmitted the report on February 19, 2013 and received an approval from ACO Owens eight days later (February 27) (R4, tab 37c at 1).

39. As a result of all this, GSC was not able to submit its foundation design until March 14, 2013 (R4, tab 37e; ex. G-12 at 8). It submitted its final design for the project on June 13, 2013, and began excavation on the 168th Warehouse site that day (R4, tab 21 at 14-15, tab 32 at 261, tab 37f).

40. By the time it began excavating, GSC had expended 52.5% of the 495-day performance period. GSC states in its brief (PFF 40) that it completed the building pad work on August 12, 2013; thus the actual work took only 61 days, even with the time required for Harper to remedy the differing site condition.

9

41. GSC submitted a certified claim to the contracting officer for four delay issues, (the building pads, fire water flow test, cold formed metal framing, and design revision 3) on June 26, 2014. It sought a 246-day time extension for all of the delays and $328,293.82 in extended overhead costs. (R4, tab 29) The contracting officer did not issue a final decision and on September 26, 2014, GSC filed an appeal based on a deemed denial that the Board docketed as ASBCA No. 59601.

*Fire Water Flow Test*

42. A flow test is necessary to determine water main pressure and flow (gallons per minute) for the design of a fire suppression system (tr. 6/69, 7/131). The contract provided for the test to be conducted relatively early in the contract:

> FIRE PROTECTION DESIGN
>
> . . . 6. Adequacy of water supply for fire suppression systems will be determined at or before the 30% design level. Requests for flow tests should be sent (in writing) to the project manager before the 10% design level.

(R4, tab 9a at 680)

43. While this provision speaks of the "30% design level," the contract granted GSC discretion as to the state of development for the interim design it would submit to the Corps (R4, tab 9a at 81). GSC did not submit a 30% design (tr. 9/33); its proposal schedule and initial schedule referenced submission of a 60% design (R4, tab 9i at 1946, tab 110 at 5). GSC instead submitted a 65% design on February 4, 2013 (R4, tab 37d at 2).

44. While GSC did not submit a 30% design, there is nothing in the record that indicates that the parties intended to dispense with the flow test, nor is there any evidence that GSC contended that the requirement for the test had been omitted.

45. A flow test requires only about 20 to 30 minutes to perform (tr. 9/9). But to perform the test, the contract required that GSC have a quality control fire protection engineer on site (R4, tab 9 at 147-48). The contract specifically stated that specialty quality control personnel "**are not intended to be full-time, but must be physically present at the construction site during work on their areas of responsibility**" (*id.* at 147) (emphasis in original).

46. GSC did not submit for approval a fire protection engineer until September 10, 2013 (R4, tab 33 at 450, tab 58b at 3). It first conducted the flow test (unsuccessfully) on October 25, 2013, or more than eight months after it submitted the

10

65% design, and four months after it submitted its final design (R4, tab 32 at 434; finding 39).

47. From September 2013 until termination, it is difficult to understand the actions that GSC took. The only testifying witness that impressed the Board with her knowledge of the flow test issue was Helen Landry. Ms. Landry was assistant fire chief at Fort Sill from 1992 until her retirement in 2008. During the SSA Warehouse contract she worked as a fir e protection specialist for the Corps as a contract employee; she was on the site "quite often" during the contract work (tr. 9/6-7, 33).

48. According to Ms. Landry's credible testimony, there were hydrants available for testing on Miner Road during the entire contract term and the Corps, in fact, had used these hydrants when it had conducted tests in 2011 (tr. 9/12-13, 16-17, 42).

49. There were hydrants closer to the SSA Warehouse building than those on Miner Road but the line for these hydrants broke in September 2013. They were not repaired until March 2014 by the Fort Sill water contractor, which prevented testing on this line during that time (tr. 9/8, 34-35, 38-39).

50. GSC seems to advance two delay theories concerning the flow test but it does not explain how or whether they fit together. First, it seems to believe that it was required to perform the tests at the hydrants with the broken line because they were closest to the warehouses (app. br. at PFF 47, 49). However, it has not identified any contract provision or written direction from the Corps, nor does it identify any specific person at the Corps who verbally directed it to perform the test at the broken line.

51. In its brief, GSC cites the "National Fire Protection Act Section 13" as requiring the test at the nearest hydrant, but we believe it is referring to guidelines published by the National Fire Protection Association (app. br. PFF 49; tr. 9/35). However, it has not provided us with any standard or guideline and Ms. Landry testified that she knew of no requirement that the test be conducted at the closest fire hydrant (tr. 9/42).

52. Second, GSC appears to contend that it was delayed by Harper's work on the water lines for the infrastructure contract (app. br. at PFF 48, 63). However, Ms. Landry testified credibly that any new lines or hydrants installed by Harper did not have to be active for GSC to conduct a flow test (tr. 9/17).

53. The Board finds that GSC created this problem for itself by failing to conduct the flow test before it submitted the 65% design. If it had done so, the water line break would never have been an issue. Further, it does not seem to have

11

understood where it could perform the flow test. GSC has not proven a flow test delay.

*Cold Formed Metal Framing/Design Basis Threat*

54. GSC used cold formed[4] metal framing to construct the exterior walls of the buildings (tr. 8/112).

55. The MATOC, under Special Contract Requirements, provided:

> 1.7. RESPONSIBILITY OF THE CONTRACTOR FOR DESIGN (MAY 02)
>
> (a) The Contractor shall be responsible for the professional quality, technical accuracy, and the coordination of all designs, drawings, specifications, and other non-construction services furnished by the Contractor under this contract. The Contractor shall, without additional compensation, correct or revise any errors or deficiency in its designs, drawings, specifications, and other non-construction services and perform any necessary rework or modifications . . . .
>
> 1.9. CONSTRUCTOR'S ROLE DURING DESIGN (JUN 98)
>
> The Contractor's construction management key personnel shall be actively involved during the design process to effectively integrate the design and construction requirements of this contract. . . . the constructor's involvement includes, but is not limited to actions such as: . . . ensuring constructability and economy of the design, [and] integrating the shop drawing and installation drawing process into the design.

(R4, tab 28n at 1921-22)

56. The contract, at SOW 5.13, SECURITY (ANTI-TERRORISM STANDARDS), required GSC to comply with DoD Minimum Antiterrorism Standards for Buildings, UFC [Unified Facilities Criteria] 4-010-01. The clause stated

---

[4] "Cold formed" means that heat is not used to form the metal (tr. 5/23-24).

that the "element of those standards that has the most significant impact on project planning is providing protection against explosive effects." (R4, tab 9a at 55)

57. In January 2012 when the Corps issued the task order RFP, the 2007 version of UFC 4-010-01 (2007 UFC) was in effect; DoD updated the standard in February 2012 (2012 UFC). The 2007 UFC was easier to meet because, if minimum standoff distances were met, it did not require a specific analysis of blast effects (R4, tab 143 at 39-40; tr. 9/101-02). The 2012 UFC required such an analysis unless the design matched specific criteria in table 2-3 of the standard, including, among other things, the height or span of the steel studs (R4, tab 163b at 75-76; tr. 9/53-54).

58. On January 28, 2013, in request for information (RFI) 0004, GSC asked the Corps whether it should use the 2007 or the 2012 UFC. On February 4, 2013, the Corps informed GSC that it should use the 2007 UFC. (R4, tab 35 at 4) GSC's designer thereafter followed the 2007 UFC in preparing the design (*e.g.*, R4 tab 37e at 13, 19).

59. GSC retained a structural engineer to prepare shop drawings for the cold formed metal framing.[5] The structural engineer inexplicably used the 2012 UFC in creating the shop drawings. GSC's quality control manager did not notice the mistake and on September 20, 2013, he signed a submittal for the shop drawings, certifying that he had reviewed them in detail and that they were in strict conformance with the contract. (R4, tab 164 at 1, 4)

60. The parties agree that if GSC had submitted the shop drawings under the 2007 UFC, they would have been approved (gov't resp. br. at 20; app. reply at 8). But the Corps' structural engineer responsible for reviewing the shop drawings was unaware of its response to RFI-0004. He saw that the shop drawings had been prepared using the 2012 UFC and reviewed them under that standard (tr. 9/58-60).

61. The shop drawings did not match the criteria in table 2.3 of the 2012 UFC but GSC had not submitted the blast analysis required by the 2012 version. The Corps rejected the submittal (R4, tab 164 at 1; tr. 9/53-54, 57). GSC submitted the shop drawings four times before the Corps approved them on May 6, 2014 (R4, tabs 164-67). GSC's structural engineer continued to use the 2012 UFC through the fourth submittal (R4, tab 167 at 6).

---

[5] FAR 52.236-21(d) (finding 1) defined shop drawings as: "drawings, submitted to the Government by the Contractor . . . showing in detail (1) the proposed fabrication and assembly of structural elements and (2) the installation (*i.e.*, fit, and attachment details) of materials or equipment."

62. GSC does not challenge the Corps' contention that it did not provide blast calculations sufficient to meet the requirements of the 2012 UFC until the fourth submittal.

63. Another issue that caused some confusion was whether the SSA Warehouse project was inside a controlled perimeter. This did not matter under the 2007 UFC, but under the 2012 UFC it dictated the explosive charge the structures had to be designed to resist (tr. 7/103-04, 9/77, 84-86, 100, 104-05). When the Corps' structural engineer rejected the first shop drawing submittal on October 17, 2013, he informed GSC it was his understanding that the project was not inside a controlled perimeter and GSC must get a letter from Fort Sill Security clarifying this (R4, tab 164 at 2).

64. GSC did not contact Fort Sill Security, however, and did not re-submit the shop drawings until March 4, 2014 (R4, tab 165). The issue was not resolved until ACO Owens, to assist GSC, went to the relevant Fort Sill officials and obtained a memorandum that he provided to GSC on April 2, 2014, (prior to the third shop drawing submittal) indicating that the project was inside a controlled perimeter (ex. A-45 at 2; R4, tab 166).

65. By letter dated March 7, 2014, GSC submitted what it called an REA, seeking a final decision from the contracting officer related to the cold form metal framing. It sought $99,950 and a 100-day time extension. (Ex. A-85) The contracting officer did not issue a final decision and the Corps denies receiving the REA (gov't resp. br. at 22); GSC did not appeal. The applicable claim for this issue is, therefore, the June 26, 2014 claim (R4, tab 29).

66. GSC contends that it suffered 214 days of delay as a result of the multiple submissions of the shop drawings (app. br. at 23). However, its expert calculated only 134 days of excusable delay, 76 of which were compensable, (and which overlap with delays from other issues including the flow test) (R4, tab 115).

*Design Revision 3/Additional Site Electric Power*

67. GSC advises the Board that design revision 3 "was a concurrent, non-driving delay" and that the Board "need not address" it (app. br. at 37). Perhaps for this reason, neither party provides a thorough explanation of this issue. The correspondence during the project tends to be brief, and, in some cases, technical, and it is quite difficult to discern the precise areas in dispute. However, we address it because it would be a fallback delay if the Board rejects its contentions concerning the cold formed metal framing delay, as we do.

68. In September 2013, more than three months after GSC submitted the final design, it submitted RFIs to the Corps concerning the electrical panels and rain

14

harvesting equipment. On September 25, 2013, GSC submitted RFI-0041 concerning Drawing E601, Panel Schedule. GSC stated "Panel HA is showing 7 spots available for extra circuits, a total of 8 circuits are required per the IFC [issued for construction] drawings. Panel HA is insufficient." GSC added: "Panel HA can be a 60 circuit panel instead of a 42 circuit panel. We need to know how much power the site lighting circuits require to determine if the panel service needs to increase." (R4, tab 35 at 81-82)

69. On October 4, 2013, the Corps, through electrical engineer Victor Sears, responded by providing a review of the contract requirements and the IFC drawings. Mr. Sears' conclusion was "[i]f Panel HA is installed per the IFC panel schedule, the 42-position panel already meets contract requirements for future spaces. No change is necessary." (R4, tab 35 at 81)

70. Thus, while RFI-0041 raised the possibility of changing from a 42-circuit panel to a 60-circuit panel, the Corps stated that was not necessary. Accordingly, the Board sees nothing in RFI-0041 that increased or changed the contract requirements.

71. On September 25, 2013, GSC also submitted RFI-0042. It stated: "Infrastructure drawings ES105 keyed note 8, states (2) 3 phase 480 volt circuits, (2) 3 phase 280 volt circuits and a single phase 120 volt circuit for rain harvesting equipment per panel schedule. On the IFC drawings E601 and E602 this equipment is not accounted for." It further stated: "[w]e need information regarding the electrical requirements for the rain harvesting equipment so we can make sure we have room for it on the current service." (R4, tab 35 at 83-84)

72. On October 4, 2013, Mr. Sears responded: "[u]se the information on sheet ES-105 in Keyed Note 8 to verify the capacity of the bldg service, panel feeders, panel ratings, and panel loading. Use the FLA ratings in the NEC for the 4 motor loads and assume 80% loading on the controller circuit." (R4, tab 35 at 83)

73. Mr. Sears did not testify, nor did any other witness with expertise in electrical design or installation. No witness explained RFI-0042. Mr. McKnight testified for GSC on this delay but the Board found his testimony imprecise and confusing (tr. 5/185-210). The Board finds that it is unclear whether the terse and highly technical response to RFI-0042 changed or delayed the work.

74. On November 19, 2013, GSC submitted what it referred to as "Revision 3 Miscellaneous Changes" (R4, tab 101a). A memorandum summarizing the contents of the submission stated, among other things, that on Drawing E-601 GSC had "[a]dded site lighting and rain harvest equipment to Panels HA and LA" (*id.* at 2). The Corps approved the submittal on January 24, 2014 (*id.* at 1).

15

75. On January 21, 2014, GSC submitted an REA seeking $81,140 in costs related to what it referred to as "additional site power." The body of the letter was only one paragraph in length and was conclusory, stating "[a]s the COE is aware, GSC had no way to anticipate the cost for the site lighting and power requirements for the rain harvesting system." (R4, tab 36 at 53) ACO Owens denied the REA by letter dated March 17, 2014. His letter was also conclusory, but he contended that GSC should have been aware of the requirements because the Corps had provided offerors "the entire Infrastructure Contract requirements for coordination purposes." (R4, tab 36 at 121)

76. GSC's certified claim dated June 26, 2014, is also conclusory (R4, tab 29). Previously, on April 29, 2014, GSC had requested a contracting officer's final decision and $84,140 due to the site power issue. While the letter was slightly longer than the January 21, 2014, REA, it was again conclusory:

> As the COE is aware, GSC had no way to anticipate the cost for the site lighting and power requirements for the rain harvesting system. The additional site power increased the main building panel and added additional panels and circuits to the electrical distribution.

(R4, tab 4 at 6)

77. The contracting officer did not issue a final decision and GSC did not appeal its April 29, 2014 claim.

78. The record includes no evidence supporting a finding that there were any evolutions in the design resulting from RFIs 0041 and 0042 that delayed the project, particularly in light of GSC's design responsibilities in this design-build contract. Nor has it demonstrated that it could not have anticipated this work based on the drawings attached to the RFP. Finally, GSC has not proven the number of days of delay, if any, that resulted from this issue. Accordingly, GSC has not proven a delay related to design revision 3.

*GSC Allegations Concerning Good Faith and Fair Dealing*

79. GSC contends that the Corps breached the duty of good faith and fair dealing, that Corps employees acted in bad faith, and that the contracting officer abused his discretion when he terminated the contract. We review its discrete allegations.

16

A.  Failure to Grant Time Extensions

   *i. Hairpins*

80.  GSC alleges that the contracting officer breached the duty of good faith or acted in bad faith by refusing to provide appropriate time extensions.  In addition to those delays discussed above, GSC relies on a March 7, 2014, claim it submitted to the contracting officer seeking a 35-day time extension related to "hairpins" (ex. A-80).  The parties have not referred us to any final decision by the contracting officer.

81.  GSC's design provided for bolts to anchor the main columns to the building foundation.  Hairpin reinforcement bars go through the anchor bolts and back into the concrete.  They are important because they provide shear support for the anchor bolts (tr. 1/97, 3/103-04; *see* R4, tab 37g at 3340).  As ACO Owens explained:

> when you put the wind load or even a load on those
> A-frames, they're going to have bilevel stresses on them,
> and they push out in the concrete.  Without those hairpins,
> concrete doesn't work in shear.  Concrete only works in
> compression, so the steel picks up that shear and holds the
> structural steel where it needs to be.

(Tr. 3/108, *see* tr. 1/148)

82.  Failure to install the hairpins, or to install them correctly, could present problems ranging from wear and tear on the slab up to collapse of the building (tr. 3/108-09, 9/127-28).

83.  This problem began when GSC reported that it had installed the wrong size anchor bolts on two columns in the 168th warehouse building (tr. 3/102).  While this was a problem, it proved to be a serendipitous event for the building's users.  When ACO Owens visited the site, he had some questions on how GSC was going to restore concrete it had chipped out to fix the bolts, but "then all of a sudden, looking at it, I realized, you're missing hairpins.  Where are they?  They had no answer.  We went and looked at all the locations that were chipped out.  They didn't have hairpins on column line B."  (Tr. 3/103)

84.  Looking further, ACO Owens found other areas where GSC had installed the hairpins but had installed them incorrectly (tr. 3/106).  GSC's design called for them to be installed in the upper half of the anchor bolt and in a horizontal position, but they were installed in the bottom half and "splayed in directions that were other than horizontal" (tr. 9/135).  The Corps quality assurance representative also found that

17

GSC had bent the hairpins incorrectly (tr. 1/99-100). Ultimately, the Corps found that GSC had installed the hairpins incorrectly at 80-85% of their locations (tr. 9/142).

85. The Corps demanded that GSC provide written confirmation from its designer that it had considered the placement of the hairpins and that the lateral loads would be transferred effectively to the slab per the design calculations (R4, tab 177 at 2414). GSC's designer proffered a solution, but Brannon Cundey insisted that the as-built configuration was acceptable; GSC continued to perform work, which only increased the defective work to be fixed. More than two months passed before Mr. Cundey agreed to fix the hairpins. (Tr. 9/127-28; R4, tab 177 at 3168)

86. GSC contends that "the Corps unduly expanded the inspection requirement and forced GSC to inspect every hairpin previously installed" and that this "greatly increased the time required to fix the missing hairpins from a few hours to several months" (app. resp. br. at 23). Given our findings that missing or defective hairpins can present problems up to collapse of the building and that GSC had installed 80-85% of them incorrectly, we consider this contention absolutely astonishing.

87. The Board finds that GSC created this problem for itself and failed to mitigate any delays. The Board further finds that the Corps acted reasonably in ensuring that all of the hairpins had been installed correctly.

ii. *Damaged Roof Panels*

88. On June 23, 2014, GSC submitted a claim in which it sought a 42-day time extension and $92,126.50 for damaged roof panels consisting of: 16 roof panels damaged when Harper's forces ran over them; 46 panels damaged when GSC relocated them because the Corps failed to provide a laydown area; and 26 panels damaged due to high winds (app. supp. R4, tab 50).

89. This issue is not adequately explored in the parties' briefs, but, as best we can tell: 1) the contracting officer did not issue a final decision; 2) GSC is using the claim in support of its entitlement to a time extension with respect to the default termination but is not asking the Board to award it the $92,126.50 referenced in the claim; and 3) GSC's expert did not provide any support in his report or testimony for a delay to the project due to damaged panels (ex. A-115; tr. 7/8-160).

90. In its briefs, GSC does not tell us much more than it views the damage to the panels as "undisputed" and that it is "irrelevant" that if it had kept to its schedule, the panels would have long since been installed when the damage occurred (app. resp. br. at 18). With respect to the wind damage, Mr. McKnight testified that the panels were damaged in what he called a "microburst" or a "mini-tornado" (tr. 6/8) but we have not been referred to any documentation of such a weather event.

18

91. The Corps agrees that Harper damaged six panels on or about May 20, 2014. It contends that GSC is at least partly to blame because the panels should have been secured; by that date GSC had removed its site superintendent and one of its quality control managers (*see* R4, tab 32 at 991, 994) and, as a result was not supervising the work properly. Further, ACO Owens testified that GSC damaged numerous panels when it unloaded them (tr. 9/157). Unfortunately, it is not clear from the testimony if these are the same damaged panels to which GSC is referring and the record and briefing is inadequate for the Board to sort out which panels were damaged by which contractor or event.

92. The Board finds that GSC has not proven that damage to panels for which the government was responsible delayed the completion date of the project.

B. The Magnificent Seven

93. In January 2014, as a result of customer surveys, the Corps conducted a review of Fort Sill projects that had fallen behind schedule. After examining all Fort Sill projects worth more than $500,000 that it had managed from July 2012 to January 22, 2014, it found that about three-quarters had been completed early or on time but there were seven projects that were late (defined as completed or projected to complete more than 14 days after the scheduled building occupancy date) for reasons that could not be readily identified (ex. A-12 at 5). The Corps did a "deep dive" to understand why these projects had fallen behind schedule. GSC was the contractor on two of the seven contracts. (Tr. 2/215-16; ex. A-12)

94. The area engineer for Fort Sill, Richard West, dubbed the contracts the Magnificent Seven. At the hearing, both he and the Fort Sill resident engineer, Keith Maxwell, denied that they used the term Magnificent Seven to disparage the contractors (tr. 2/182, 9/128-29).

95. GSC contends in its brief that the "obvious significance" of this name is that, in the movie, "many of the Magnificent Seven died" (app. resp. br. at 3, n.3). Mr. West testified that he had not even seen the movie and did not make this connection (tr. 9/129-31). GSC contends that the name shows that a group of Corps employees (which it calls the "Magnificent Seven cabal") were targeting GSC (app. resp. br. at 3, n.3, 10).

96. The Board finds that the Magnificent Seven process was merely an investigation into why these projects fell behind so that the Corps could "find common themes and areas for improvement" (ex. A-12 at 1). While using this name was likely an attempt at dry or sardonic humor, there is no evidence that the "Magnificent Seven cabal" had any animus towards the contractors performing these contracts, took any

19

inappropriate actions against the contractors, or sought to embarrass them by using this name internally.

C.  Harper Favoritism

97.  GSC contends that the Corps' "disparate treatment of GSC and Harper is persuasive evidence of bad faith" (app. resp. br. at 11).  Among other things, GSC contends that the Corps did not include Harper in the Magnificent Seven or terminate its contract even though its project fell more than 500 days behind schedule (*id.* at 3, 10).

98.  While Harper did fall far behind schedule, ACO Owens testified credibly that GSC was the reason Harper fell behind.  As he explained, part of Harper's work included the demolition of existing warehouses.  These warehouses were to be demolished when GSC finished construction of the 168th Warehouse.  Once GSC fell behind, Harper's project fell "day for day" behind.  Moreover, when the contracting officer terminated GSC's contract in June 2014, the delay to Harper's work "went completely wild," in that work ground to a halt and Harper had to release its subcontractors from the project.  Harper was only able to bring the subcontractors back in November 2014 but at that point "the subs trickled back, and they couldn't come back with full force, because they had work elsewhere."  Harper never succeeded in fully restoring staffing levels.  (Tr. 3/159-60)

99.  GSC also relies on emails from a Corps contract employee responsible for reviewing schedules who expressed frustration that he had repeatedly found some dates in the Harper schedules to be incorrect.  He requested support from his superiors in getting Harper to make the corrections and raised the issue of favoritism if this were not done (app. exs. 8-9).  However, he testified at the hearing that Harper and GSC were not treated any differently.  He further testified that Harper fixed its schedules and the Corps did not have consistent problems with the Harper schedules as it did with GSC (tr. 2/133-34).  The emails in question strike the Board as nothing more than a worker expressing vexation at a recurring but ultimately minor problem.

100.  The Board finds that GSC has not proven that the Corps improperly favored Harper.

D.  Partnering

101.  The contract contained the following provisions with respect to partnering:

3.1.3  Partnering & Project Progress Processes

3.1.3.1  The initial Partnering conference may be scheduled and conducted at any time with or following the post award conference.  The Government proposes to form a partnership with the DB contractor to develop a cohesive building team. . . .

3.1.3.2  As part of the partnering process, the Government and Contractor shall develop, establish, and agree to comprehensive design development processes including conduct of conferences, expectations of design development at conferences, fast-tracking, design acceptance, Structural Interior Design (SID)/Furniture, Fixtures & Equipment (FF&E) design approval, project closeout, etc.  The government will explain contract requirements, and the DB contractor shall review their proposed project schedule and suggest ways to streamline processes.

(R4, tab 9a at 80)

102.  While this clause does not limit partnership meetings to the earliest stages of the project, the Board finds that the benefits of any such meetings would be skewed to the early stages of the project, and, in practice, that is when partnering meetings typically occur (tr. 2/178, 3/275).  The Board finds that the portions of the clause that address the development of a cohesive team, the conduct of conferences, the design development and approval process, the proposed project schedule, and suggestions on ways to streamline processes would be most likely to have benefits during the initial months of the project.

103.  GSC first requested a partnering meeting on January 28, 2014, after the contracting officer had issued the first show cause notice, and six days before it was supposed to complete the project (R4, tab 7 at 1; ex. A-41).  The Corps did not agree to engage in a partnering meeting because it viewed the issues between the parties as contractual disputes for which GSC needed to submit an REA or claim (tr. 2/178), as CO Kloeckler advised GSC in his February 24, 2014, letter (finding 5).

104.  By the time GSC belatedly requested a partnering meeting, the Corps and GSC had long been engaging in three types of regular meetings:  a weekly progress meeting between GSC and ACO Owens and his team at which GSC was allowed to place items on the agenda; a monthly progress meeting between GSC and the Corps to

21

discuss payments; and coordination meetings with Harper, GSC and the Corps to discuss each contract and coordinate the work (tr. 3/96-97).

105. In addition, after CO Kloeckler issued the second show cause notice, he granted Brannon Cundey's request for a meeting at which CO Kloeckler, ACO Owens and other Corps personnel attended on May 6, 2014. CO Kloeckler invited GSC President Locke McKnight to the meeting but he failed to attend. At the meeting, the parties discussed, among other things, GSC's lack of progress. (Tr. 2/327-28, 3/34) ACO Owens met with Locke McKnight on May 15, 2014, at which they discussed the issues in dispute, as well as on two previous occasions (tr. 3/151-52).

106. GSC has not explained why the issues it wanted to discuss at a partnering meeting could not have been discussed at one of these meetings, or what could have been accomplished at a partnering meeting given the contractual nature of the dispute. The Board finds that the refusal of the Corps to engage in a partnering meeting requested six days before the expiration of the contract term is not evidence of bad faith or a lack of good faith and fair dealing.

E. Antagonism of Corps Employees

107. In its briefs, GSC attacks Corps employees, chiefly ACO Owens, contending that they had "animosity" towards GSC (app. resp. br. at 15). Much of GSC's discontent with ACO Owens stems from his rejection of GSC's contentions on the building pads, the fire water flow test, and the cold formed metal framing described above (*e.g.*, app. br. at PFF 15, 34, 45, 73).

108. GSC advances a number of other unsupported allegations. For example, it contends that ACO Owens refused to approve a QC manager for the project "due to [his] prior employment with GSC" (app. resp. br. at PFF 136). However, when one reads the testimony GSC cites, ACO Owens actually stated that the person proposed had been the QC manager for GSC on another Fort Sill project and had performed poorly. As of the date of the hearing major quality control issues remained open on that project including, among other things, the provision of as-built drawings and operations and maintenance manuals (tr. 3/269-71).

109. GSC also contends that Mr. Owens withheld for over a year a document from the base commander concerning whether the SSA project was inside a controlled perimeter (app. resp. br. at 12; *see* findings 63-64) but there is no evidence that ACO Owens knew the document existed before he obtained it on GSC's behalf. Similarly, GSC's contention that ACO Owens would wait months to approve a submittal and then backdate it to make it appear that he had acted in a timely manner was disproved at the hearing. For example, GSC alleged that ACO Owens had

approved a submittal in March 2014 (app. PFF 73) but the Corps produced the document with a digital signature by him on January 24, 2014[6] (R4, tab 101a).

110. Finally, GSC also places a great deal of weight on testimony by Keith Adams, a construction management contractor retained by the Corps, that was, in essence a very unflattering assessment of one of the GSC officers (tr. 1/196, 249). The Board finds that the statement by itself is insufficient to prove bad faith. This would not be the first construction project where there was a clash of personalities and the Corps witnesses backed up their criticisms of GSC with specific examples. For example, ACO Owens testified that GSC's site superintendent repeatedly overruled the decisions of his quality control manager, resulting in a frequent need to redo work (tr. 3/171).

111. Of more concern, this superintendent overrode the decisions of GSC's safety officer so many times that ACO Owens told Brannon Cundey that he no longer wanted him on the site (tr. 3/171). In a similar vein, ACO Owens testified that he objected when GSC used a Lull[7] to erect steel, which presented a safety hazard. ACO Owens met with Mr. McKnight who promised that GSC would stop using the lull and use a crane to lift the steel. Instead, GSC continued using the lull. When ACO Owens discussed it with the site superintendent, he told ACO Owens that Mr. McKnight had instructed him to continue using the Lull (tr. 3/178-79). These are serious issues and the Board is not surprised that they drew the ire of the administrative contracting officer or other Corps representatives.

DECISION

FAR 52.249-10 (which was incorporated in the contract) provides:

> (a) If the Contractor refuses or fails to prosecute the work or any separable part, with the diligence that will insure its completion within the time specified in this contract including any extension, *or fails to complete the work within this time, the Government may, by written notice to the Contractor, terminate the right to proceed with the*

---

[6] Mr. McKnight also testified that ACO Owens, on a previous contract, had told Mr. McKnight he intended to make his life "a living hell" because he (Owens) was unhappy that the contracting officer had agreed to provide GSC an equitable adjustment (tr. 6/180). Because Mr. McKnight made this allegation for the first time on re-direct when he was not subject to re-cross, and because ACO Owens denied it (tr. 9/199), the Board finds the allegation not credible.

[7] A Lull is a type of equipment known as a material handler. *See Norman v. Textron, Inc.*, 2018 WL 3199496 at *3-4 (W.D. Mo. 2018).

23

*work* (or the separable part of the work) that has been delayed. . . .

(b) The Contractor's right to proceed shall not be terminated nor the Contractor charged with damages under this clause, if—

(1) The delay in completing the work arises from unforeseeable causes beyond the control and without the fault or negligence of the Contractor.

(Finding 1) (emphasis added)

The plain language of this default clause provides that the government may terminate the contractor for failure to complete the work on time. The government has met its initial burden to prove that its termination was justified by showing that GSC failed to complete the contract on time (finding 3); *see Lisbon Contractors, Inc. v. United States*, 828 F.2d 759, 765 (Fed. Cir. 1987). The burden shifts to GSC to show that its nonperformance was excusable. *DCX, Inc. v. Perry*, 79 F.3d 132, 134 (Fed. Cir. 1996).

GSC attempts to meet its burden by contending: 1) that it was entitled to time extensions to December 21, 2014, so that it was not in default at the time of termination; 2) that the Corps waived the February 3, 2014, completion date; 3) that the Corps breached the duty of good faith and fair dealing in its conduct during the project; and 4) that the contracting officer abused his discretion by failing to consider properly the factors in FAR 49.402-3(f). We consider these in turn.

1. The Alleged Delays

GSC must show that it is entitled to time extensions until the December 21, 2014 date calculated by its expert as the date it could finish the project (finding 9). In other words, it would not be enough if it could show that it was entitled to a time extension until a date after the February 3, 2014, contract completion date but short of December 21, 2014. *Empire Energy Mgmt. Sys., Inc. v. Roche*, 362 F.3d 1343, 1351-52 (Fed. Cir. 2004). By our count then, GSC needs to prove that it is entitled to the days it seeks for the building pad, fire water flow test, and cold formed metal framing issues, or, if its proof on the cold formed metal framing fails, possibly the design revision 3 or hairpin delays (finding 11).

24

A.  The Building Pads

Although both parties refer to this issue as the building pad claim, the Board believes that a more precise description would be whether the contract required GSC to remove and replace the unsuitable fill (findings 26-31); simply stating that Harper was to provide GSC a building pad does not, in and of itself, address which party is responsible for removing the expansive fill.  The Board holds that the SSA Warehouse task order assigned this responsibility to GSC.  In so ruling, the Board finds that the contract is notable both for what it says, and what it does not say.

First, the contract did not say that the existing expansive soils must be removed.  GSC could have left it in place if it had chosen the pier and beam foundation identified in the contract and used on many other buildings at Fort Sill (finding 21).  The contract stated that GSC was responsible for any specific site preparation required to accommodate its choice of foundation (finding 17).  Because removal of the existing soil was necessary only to accommodate GSC's choice of a waffle mat slab (*id.*), the contract assigned responsibility for it to GSC.

Second, the contract required GSC to excavate if necessary and place select fill (finding 17).  While it required Harper (after demolition of the existing buildings) to leave the site at specified grades and density, it did not speak of Harper replacing the existing soil with select fill (findings 16-17).

Third, while the contract drawings stated that Harper was responsible for grading to the bottom of the base layer, they specifically provided that GSC was responsible for the subbase (findings 18-19).  The inert or select fill formed the subbase for the buildings (finding 21).  In other words, the drawings effectively assigned placement of the select fill to GSC.

Fourth, GSC indicated in its proposal (which was incorporated in the contract) that it understood what the contract required because it proposed to remove the existing fill and replace it with select structural fill (findings 22-23).

GSC raises a variety of arguments in response.  It places a lot of emphasis on appendix RR of the contract (Contract Duration), which provided that Harper would provide GSC the building pad sites "complete" 120 days after the notice to proceed (finding 14).  GSC seems to read the word complete to mean that Harper would remove and replace the existing fill (app. br. at 33).  We disagree.  We must construe a contract "to effectuate its spirit and purpose giving reasonable meaning to all parts of the contract."  *LAI Servs., Inc. v. Gates*, 573 F.3d 1306, 1314 (Fed. Cir. 2009) (quoting *Hercules, Inc. v. United States*, 292 F.3d 1378, 1381 (Fed. Cir. 2002)).  The word complete must be read in the context of the specific tasks that the contract assigns to GSC and Harper.  Reading "complete" as expansively as GSC does would nullify the

25

provisions discussed above that make GSC responsible for placing select fill and the subbase and which required Harper only to grade and compact the area.

With respect to its proposal, GSC tries to explain the statements concerning the removal and replacement of select fill by stating that it did not specifically state that GSC would do this and that it was only providing information for Harper to perform the work (app. br. PFF 15). But the Board concludes that when an offeror uses action verbs such as remove and replace in its proposal, a reasonable agency would understand them to refer to actions that the offeror proposes to take, not the actions of another contractor beyond the control of the offeror. A reasonable offeror would have identified actions it did not propose to take but would have to be performed by another.

GSC also relies upon the TEMF Complex specification concerning building slab construction that was attached to the task order for information purposes but not made part of it (finding 24; app. PFF 17, 22). This provision specified how Harper would excavate and replace the existing soil with inert fill when constructing building slabs, but GSC takes it out of context. The TEMF Complex contract required Harper to construct several buildings and the provision in question merely specified how to construct the building slabs for *those* buildings. It is an unwarranted leap to read the provision as requiring Harper to remove and replace soil on behalf of GSC absent a specific statement to this effect in at least one of the contracts.

Finally, in its reply brief, GSC addresses SOW 6.3.1.2, which provided that GSC was responsible for placement of select fill (if necessary) (finding 17). GSC would have us read this provision so that it only took effect after Harper provided GSC "a properly constructed building pad," where the unsuitable soil had been replaced (app. reply at 5). GSC thus flips the responsibility for placing the select fill onto Harper and contends that its own responsibility for placing select fill came into effect only if the site somehow changed in the limited time between Harper turning over the pads and GSC beginning its work. The contract, of course, said nothing about Harper placing select fill, as we have explained.[8]

In conclusion, the contract supports the interpretation of the Corps, not GSC. As for delays, the Board believes that there is evidence supporting a delay of up to about 25 days for a differing site condition due to the wet heavy soil discovered under the 168th warehouse site (findings 32-34), but such a claim is not before us and such a

---

[8] At page 5 of its reply brief, GSC suggests but does not develop the argument that the requirement in 6.3.1.2 for GSC to place select fill is severely constrained by the phrase (prior to a semi-colon) "[t]ime and weather conditions may affect the actual condition of the building site(s)." GSC has waived this argument and, in any event, we disagree. The most reasonable interpretation of this language is that they are simply an explanation for why GSC must accept the site "as is."

brief delay would not make any difference with respect to GSC's challenge of the default termination under the rule of *Empire Energy Management* discussed above. The Board also concludes that GSC was responsible for many of the days of delay it is seeking due to its slow start with the geotechnical work and its failure to begin excavation until more than half the contract time had passed (findings 36-40).

B.  Fire Water Flow Test

Although not squarely raised by GSC, we address one contract interpretation issue, namely, the conflicting contract requirements that required GSC to perform its flow test before the 30% design with other provisions that gave GSC discretion as to its interim design submittal and resulted in its submission of a 65% design (finding 43). No one has contended that the flow test was omitted from the contract when the 30% design was not required (finding 44).

The Board must interpret the contract as a whole so as to harmonize and give reasonable meaning to all of its parts. *NVT Techs., Inc. v. United States*, 370 F.3d 1153, 1159 (Fed. Cir. 2004). The Board believes that the most reasonable harmonization of these design provisions is to conclude that the contract required a flow test, and that it required it by the 30% level or, if there was no 30% design, the design substituted for it, namely the 65% design. If GSC had complied with that, it would have performed the flow test in early 2013, but it did not hire a fire protection quality control specialist until September 2013 and could not perform the test until then, when more than 70% of the contract time had elapsed (finding 46). Its dilatory hiring of the fire protection professional combined with its misunderstanding of the sites at which it could perform the tests caused the delay, not any action by the Corps (findings 48-52).

Accordingly, GSC is not entitled to a time extension for the fire water flow test.

C.  Cold Formed Metal Framing

As described above, this issue came about after the Corps informed GSC that it could follow the less restrictive 2007 UFC in designing the building. GSC's designer did so, but the message did not reach its structural engineer who followed the 2012 UFC, and its quality control manager failed to catch it, resulting in four shop drawing submissions over six months. (Findings 59, 61)

GSC places the blame for this delay entirely on the government because the first cold formed metal framing shop drawings would have been approved if they had been submitted and reviewed under the 2007 UFC (finding 60). The Board disagrees.

27

This was a design-build contract, meaning that the government paid GSC to perform the design. MATOC special contract requirement 1.7 provided that "[t]he Contractor shall be responsible for the professional quality, technical accuracy, and the coordination of all designs, drawings, specifications, and other non-construction services furnished by the Contractor." (Finding 55) Further, MATOC special contract requirement 1.9 provided that GSC's "construction management key personnel" were to be "actively involved during the design process" and were responsible for "ensuring constructability and economy of the design, [and] integrating the shop drawing and installation drawing process into the design" (*id.*). The Board interprets these provisions to mean that GSC personnel were responsible for coordinating the design work and ensuring that the shop drawings were consistent with the overall design, which followed the 2007 UFC (finding 58). GSC's management clearly failed to coordinate the work of the structural engineer and its designer (finding 59).

In addition, FAR 52.236-21(e) provided that GSC was supposed to "coordinate" shop drawings "and review them for accuracy, completeness, and compliance with contract requirements and shall indicate its approval thereon as evidence of such coordination and review." It further provided that the government's approval of the shop drawings "shall not relieve the Contractor from responsibility for any errors or omissions in such drawings, nor from responsibility for complying with the requirements of this contract." (Finding 1) Under the plain language of this clause, the government's approval of erroneous shop drawings does not shift any of the responsibility for those errors on to the government. *Structural Painting Corp.*, ASBCA Nos. 36813, 37305, 89-2 BCA ¶ 21,605 at 108,771.

Thus, while it probably would have been best if, at the time of the first submittal, the Corps had pointed out the anomaly of using the 2012 UFC to prepare the shop drawings, the contract allocates to GSC the risk that government review may not rescue the contractor from its own mistakes. We also acknowledge that the reviewer stated incorrectly in the first shop drawing rejection that the project was not within a controlled perimeter (finding 63). However, this would not have been an issue if GSC had followed the 2007 UFC (*id.*) and there is no reason to believe there would have been any delay if GSC had simply done what it was told – seek clarification from Fort Sill Security (finding 64).

Accordingly, GSC is not entitled to a time extension for the cold formed metal framing submittals.

D. Design Revision 3/Additional Site Power

As described above, GSC has not proven that the Corps required GSC to perform additional work or otherwise delayed the project with respect to its answers to RFI Nos. --0041 and -0042, or design revision 3 (findings 68-78). In addition, due to

28

GSC's description of it as "a concurrent, non-driving delay", it has not proven any days of delay (finding 78).

### E. Missing Hairpins/Damaged Roof Panels

The Board rules that the Corps' actions were prudent and entirely justified when it discovered that GSC had failed to install hairpins or had installed them incorrectly (findings 81-87). While this may have delayed the project, it was entirely GSC's fault. GSC is not entitled to a time extension for this issue.

With respect to the roof panels, GSC proved that Harper damaged six panels but this was not adequate to prove that the project had been delayed (findings 91-92).

### 2. The Corps Did Not Waive the Completion Date

As we have found, the contracting officer did not terminate GSC when it failed to complete the project on February 3, 2014, but instead, without waiving the government's rights, accepted GSC's representation that it could finish by June 9, 2014. When GSC failed to meet that completion date, the contracting officer promptly terminated the contract. (Findings 5, 8)

GSC contends that the Corps waived the completion date under the rule of *DeVito v. United States*, 413 F.2d 1147 (Ct. Cl. 1969) (app. resp. br. at 26-27). As the Board recently explained in *Watts Constructors, LLC*, ASBCA Nos. 61518, 61961, 19-1 BCA ¶ 37,382, the "waiver doctrine . . . protect[s] contractors who are led to believe that time is no longer of the essence" when allowed "'to continue [substantial] performance past a due date,' under circumstances that justify a conclusion that the default has been excused." *Id.* at 181,726-77 (quoting *Fla. Dep't, of Ins. v. United States*, 81 F.3d 1093, 1096 (Fed. Cir. 1996) (quoting *DeVito*, 413 F.2d at 1153-54)). But waiver of default does not normally apply to construction contracts absent unusual circumstances. *Id.* at 181,727 (citing *HK&S Constr. Holding Corp.*, ASBCA No. 60164, 19-1 BCA ¶ 37,268 at 181,352; *AmerescoSolutions, Inc.*, ASBCA No. 56811, 10-2 BCA ¶ 34,606 at 170,549-50). Essentially, waiver is only recognized in the case of such a default when the government manifests that it no longer considers the contract completion date enforceable. *Id.* (citing *Technocratica*, ASBCA No. 47992 *et al.*, 06-2 BCA ¶ 33,316 at 165,187).

The Board holds that the contracting officer did not waive the contract completion date. After the first show cause notice, GSC promised to complete the project by June 9, 2014, a little more than four months after the date it was required to complete the work. The contracting officer agreed but emphasized he was not waiving the completion date. (Finding 5) In the Board's view, it was reasonable for the contracting officer to give GSC the additional four months it requested before

terminating the contract, but with the caution that the government was not waiving its rights. *Red Sea Engineers & Constructors, Inc.*, ASBCA No. 57448 *et al.*, 13-1 BCA ¶ 35,245 at 173,032 (government forbearance for four months after its express reservation of rights was not unreasonably long, particularly in light of contractor's optimistic reports encouraging forbearance rather than termination).

GSC has not proven that there was anything unusual here. The contracting officer consistently advised GSC that he regarded the February 3, 2014 completion date to be in effect (findings 5-6). He gave GSC another chance to complete by June 9, 2014, but GSC failed to take advantage of the reprieve, resulting in its termination soon thereafter.

Accordingly, we hold that the government did not waive the completion date.

### 3. Good Faith and Fair Dealing/Bad Faith

GSC contends both that the government breached the duty of good faith and fair dealing and that Corps employees acted in bad faith (app. br. at 29-30, 36-37; app. resp. br. at 9). Every contract imposes upon each party an implied duty of good faith and fair dealing in its performance and enforcement. The implied duty of good faith and fair dealing includes "'the duty not to interfere with the other party's performance and not to act so as to destroy the reasonable expectations of the other party regarding the fruits of the contract.'" *Dobyns v. United States*, 915 F.3d 733, 739 (Fed. Cir. 2019) (quoting *Centex Corp. v. United States*, 395 F.3d 1283, 1304 (Fed. Cir. 2005)). But the implied duty "'cannot expand a party's contractual duties beyond those in the express contract or create duties inconsistent with the contract's provisions.'" *Id.* (quoting *Precision Pine & Timber, Inc. v. United States*, 596 F.3d 817, 831 (Fed. Cir. 2010)). A "'breach of that duty has to be connected, though it is not limited, to the bargain struck in the contract.'" *Id.* (quoting *Metcalf Constr. Co. v. United States*, 742 F.3d 984, 994 (Fed. Cir. 2014). A breach of the duty does not require breach of an express provision in the contract but a specific promise must be undermined. *Id.*

An appellant does not need to prove bad faith to show that the government has breached the implied duty of good faith and fair dealing. *Catherine Kurkjian*, ASBCA No. 61154, 20-1 BCA ¶ 37,594 at 182,539, *appeal filed*, *Kurkjian v. Secretary of Defense*, No. 2020-2201 (Fed. Cir. filed Aug. 26, 2020); *CAE USA, Inc. v. Dep't of Homeland Security*, CBCA No. 4776, 16-1 BCA ¶ 36,377 at 177,349. Bad faith can be difficult to prove because government officials are presumed to act in good faith, which can only be overcome by clear and convincing evidence to the contrary. *Road and Highway Builders, LLC, v. United States*, 702 F.3d 1365, 1368-69 (Fed. Cir. 2012).

GSC has not demonstrated that the Corps breached the duty of good faith and fair dealing or that its employees acted in bad faith. The great weight of the evidence shows that the various Corps employees tried to do the best they could with a contractor ACO Owens described as "extremely slow and nonproductive" and which had to do a lot of the work twice (tr. 3/171; findings 85, 110), had repeated safety problems (finding 111), and, absent a stroke of fortune, would have erected a structure that might have been in danger of collapse (findings 81-84). There is no evidence that the Corps treated Harper significantly better than GSC (findings 98-100).

The contracting officers did not act in bad faith by refusing to grant GSC time extensions to which it was not entitled. Nor was it bad faith or a breach of the duty of good faith and fair dealing to refuse to provide GSC a partnering meeting requested six days before the contract completion date where the Corps had provided GSC ample meetings and the issues in dispute involved contract interpretation (findings 103-06). Nor was the internal usage of the term "Magnificent Seven" to describe seven projects that had fallen behind schedule, without more, evidence that the Corps' employees were antagonistic to GSC or were targeting it for termination (findings 93-96).

### 4. The Contracting Officer Considered the Factors in FAR 49.402-3(f)

FAR 49.402-3(f) identified seven factors that the contracting officer "shall consider" before terminating the contract for default. As we have found, the contracting officer wrote a memorandum documenting his analysis of the factors (finding 8, n.1).

GSC spends considerable effort challenging the contracting officer's analysis of the FAR 49.402-3(f) factors (app. resp. br. at 14-26), but consideration of them is not a prerequisite to a valid termination. *DCX, Inc. v. Perry*, 79 F.3d 132, 135 (Fed. Cir. 1996). Although compliance or noncompliance with the regulation may aid the Board in determining whether a contracting officer abused his discretion, the regulation does not confer rights on the defaulted contractor. *Id.* A contracting officer's failure to consider one of the factors in FAR 49.402-3(f) does not require that a default termination be converted to one for the convenience of the government. *Id.*

GSC mostly uses this issue as an opportunity to repeat its contentions that it was entitled to time extensions that we have rejected (app. resp. br. at 17-24). But as the Court of Appeals for the Federal Circuit stated in *DCX*, the "contracting officer's contemporaneous memorandum and hearing testimony demonstrate that he addressed the pertinent regulatory factors and found that they did not counsel against termination under the circumstances of this case." *DCX*, 79 F.3d at 135; (finding 8, n.1).

Finally, GSC also contends in this section of its brief that CO Kloeckler failed to use his independent judgment when making the termination decision (app. resp. br.

at 15).  However, this allegation at its core is not based on much more than GSC's belief that he made the wrong decision.  We have found that CO Kloeckler credibly testified that the decision was the product of his independent judgment and analysis (finding 8).

## CONCLUSION

The appeals are denied.

Dated:  November 24, 2020


MICHAEL N. O'CONNELL
Administrative Judge
Armed Services Board
of Contract Appeals


I concur                                                       I concur in result (see separate opinion)


JOHN J. THRASHER                              TIMOTHY P. MCILMAIL
Administrative Judge                              Administrative Judge
Chairman                                               Armed Services Board
Armed Services Board                           of Contract Appeals
of Contract Appeals

SEPARATE OPINION BY ADMINISTRATIVE JUDGE MCILMAIL

*INTRODUCTION*

I concur in the denial of the appeals. I also concur (at least in result) in the plurality's rejection of appellant's claims regarding (1) the "building pad" delay; (2) the "fire water flow test" delay; (3) the "cold form metal framing" delay; (4) the "electrical design No. 3" delay; (5) the independence of the contracting officer's judgment; and (6) bad faith. In addition, I offer this separate opinion.

Appellant, GSC Construction, Inc., challenges the default termination of its construction contract, and seeks delay damages, concerning the construction of two warehouses and two accompanying, open-air "bulk storage" buildings at Fort Sill, Oklahoma. The U.S. Army Corps of Engineers, Tulsa District (government, Corps, or COE), defends the termination and opposes any monetary award. The parties refer to one of the warehouses as "the 168th," and the other as "the 100th" (*e.g.*, tr. 1/7). Those short-hand references are to two military units, each of which would use one of the warehouses and one of the bulk storage buildings (tr. 3/161-62).

In ASBCA No. 59402, the government defends the termination for default, addressing whether (1) termination for default based on failure to meet the contract completion date was appropriate; (2) the contracting officer followed termination for default procedures; (3) the government waived termination for default; (4) it was appropriate to terminate the contract for default based on failure to make satisfactory progress; and (5) termination for default is appropriate even if the Board agrees with some or all of GSC's excusable delays (gov't br. in ASBCA No. 59402 at 3).

In ASBCA No. 59402, GSC responds that (1) the government failed to carry its burden; (2) GSC was making adequate progress at the time of termination and was due time extensions for various delays to the project; (3) the government failed to follow the Corps-mandated procedure for default termination; and (4) any termination was an abuse of discretion or bad faith in the administration of the contract and the issuance of the termination notice (app. resp. in ASBCA No. 59402 at 2).

In ASBCA No. 59601, GSC seeks $328,293.82, citing 252 days of alleged delay consisting of (1) the "building pad" delay; (2) the "fire water flow test" delay; (3) the "cold form metal framing" delay; and (4) the "electrical design No. 3" delay (app. br. in ASBCA No. 59601 at 2; *see* tr. 1/28-29).

In ASBCA No. 59601, the government responds that (1) GSC has not shown government responsibility for delays; (2) each delay was chargeable to GSC; and (3) none of the delays was on the project's critical path (gov't resp. in ASBCA No. 59601 at 2).

*THE RECORD OF EVIDENCE*

A ten-day hearing of these consolidated appeals began on June 19, 2017. The record of evidence includes 15 stipulations, 54 volumes of Rule 4 material (consisting of 294 "tabs"), 139 hearing exhibits in 4 volumes, 4 volumes of daily reports, and the testimony of 18 witnesses in 10 volumes of hearing transcript totaling roughly 1,500 pages. The parties filed six post-hearing briefs between them, totaling 182 pages. Post-hearing briefing concluded on October 19, 2017. The following witnesses testified at the hearing:

| | |
|---|---|
| Keith Lee Adams: | Construction manager contractor to the Corps at Fort Sill (tr. 1/196); |
| James Braghini: | Project control scheduler, Corps, Tulsa District (tr. 2/12); |
| Brannon Cundey: | Former project manager, GSC (tr. 8/75); |
| William Dozier: | Estimator and scheduler, Blanchard & Calhoun Real Estate, Co. (tr. 5/216); |
| William Green: | Senior structural engineer, Corps, Tulsa District (tr. 9/43-44); |
| Charles Johnson: | Senior structural engineer, Johnson, Lasbocher & Associates (tr. 7/160); |
| Nathan Kloeckler: | Contracting officer, Tulsa District (tr. 2/276-77); |
| Helen Landry: | Fire protection specialist, Corps (tr. 9/6); |
| Keith Maxwell: | Resident engineer, Corps of Engineers, Fort Sill (tr. 2/139); |
| Richard McAfee: | Delay expert, called by GSC (tr. 7/8); |
| G. Locke McKnight: | Owner and president, GSC (tr. 4/230-31); |
| Stuart Ockman: | Delay expert, called by the government (tr. 4/9-10); |
| Robert Owens: | Project engineer and administrative contracting officer (tr. 3/93); |

John Phillips:          Former vice-president, GSC (tr. 6/227);

Randy Reeves:          Superintendent, GSC (tr. 8/7-8);

Richard West:          Area Engineer, Corps, Fort Sill (tr. 9/106);

Thomas Willcox:       Quality control contractor to the Corps, Fort Sill
                       (tr. 1/61); and

Christopher Veltema:  Former quality control manager, GSC (tr. 9/213-14).

*ASBCA NO. 59402:  TERMINATION FOR DEFAULT*

*I. Was it "appropriate" (that is, justified) to terminate the contract for default based on failure to meet the contract completion date?  Did the contracting officer follow termination for default procedures?  Did the government waive termination for default?  Was termination for default based on failure to make satisfactory progress appropriate?*

FINDINGS OF FACT

On January 16, 2014, the contracting officer issued a show cause notice, which GSC received on January 24, 2014 (stip. ¶¶ 11-12).  The order to show cause states:

> Since you have failed to perform in accordance with [the contract] within the time frame required by its terms, the Government is considering terminating the contract under the provisions for default of this contract.  The current required contract construction completion date is February 3, 2014 and you are 145 days behind your construction schedule as of January 15, 2014.  Pending a final decision in this matter, it will be necessary to determine whether your failure to perform arose from causes beyond your control and without fault or negligence on your part.  Accordingly, you are given the opportunity to present, in writing, any facts bearing on the question . . . within 10 days after receipt of this notice.  Your failure to present any excuses within this time frame may be considered as an admission that none exist.  Your attention is invited to the respective rights of the Contractor and the Government and the liabilities that may be invoked if a decision is made to terminate for default.

Any assistance given to you upon this contract or any acceptance by the Government of delinquent goods or services will be solely for the purposes of mitigating damages, and it is not the intention of the Government to condone any delinquency or to waive any rights the Government has under the contract.

(R4, tab 8 at 1)  GSC responded to the order to show cause on January 28, 2014 (stip. ¶ 13), saying that "[w]e will timely complete this project according to all contract requirements including time extensions to which we are entitled," and that "GSC feels confident that it can complete the project by June 9, 2014" (R4, tab 7 at 1, 3).  GSC also wrote, through its president, Mr. McKnight:

We have submitted sufficient matters of fact to merit time extensions which will put us back on schedule to completion.  We also request that if you do not accept our completion plan, that you coordinate any further action with your counsel and our counsel . . . .  Legal consultation is required before considering any action of termination as well as consultation with our Small Business representative.  I do not believe that these steps are necessary as I am confident that we will meet your needs and timely complete the contract according to the contract requirements and commitments in this letter.  We look forward to completing this project with you.

(R4, tab 7 at 4)

The construction required by Task Order DS01 was not complete by February 3, 2014 (stip. ¶ 14).  On February 24, 2014, Mr. Kloeckler became the contracting officer for the project (R4, tab 177 at 3437), and wrote to GSC that:

The Government will not terminate your firm for default at this time; however, this in no way constitutes a waiver of the contracts [sic] original contract completion date.  The Government looks forward to your firm meeting the commitments outlined in your response, including completion by June 9, 2014.

(R4, tab 6)  On March 10, 2014, GSC reiterated to the contracting officer that it could complete the project by June 9, 2014, and wrote:

> GSC concurs that termination is not warranted and looks
> forward to working with you on the remainder of the
> project.

(R4, tab 36 at 103-04)  On April 28, 2014, Mr. Kloeckler issued GSC a "Show Cause Notice," stating that:

> Since you have failed to perform in accordance with [the
> contract] within the time frame required by its terms, the
> Government is considering terminating the contract under
> contract clause 52.249-10 "Default" of this contract.
> Current required construction completion is February 3,
> 2014 and you have exceeded that date by 83 calendar days
> as of April 28, 2014.  GSC Construction has also failed to
> make satisfactory progress towards completing the project
> in accordance with the revised completion date of June 9,
> 2014 as indicated in your firms' [sic] response to the
> Governments first Show Cause notice dated January 24,
> 201[4]. . . .  Any assistance given to you on this contract or
> any acceptance by the Government of delinquent goods or
> services will be solely for the purpose of mitigating
> damages, and it is not the intention of the Government to
> condone any delinquency or to waive any rights the
> Government has under the contract.

(R4, tab 5)

On June 17, 2014, Mr. Kloekler issued a termination for default determination (R4, tab 135 at 1-3).  On June 20, 2014 (in a letter misdated June 18, 2014), the contracting officer, Mr. Kloeckler, terminated the contract for default "due to GSC Construction not meeting the contract completion date of Feb, 03, 2014 and GSC Constructions [sic] lack of satisfactory progress towards completion of the contract" (*see* tr. 3/7-8, 224, 5/53-54; R4, tab 3, tab 136; app. supp. R4, tab 46; *see* stip. ¶ 15).  The work had not been completed by the date the contract was terminated (*see* tr. 1/56-57).

*RELEVANT CONTRACT PROVISIONS*

The contract incorporates by reference FAR 52.249-10, DEFAULT (FIXED-PRICE CONSTRUCTION) (APR 1984), which provides:

> (a) If the Contractor refuses or fails to prosecute the work
>      or any separable part, with the diligence that will insure
>      its completion within the time specified in this contract

including any extension, or fails to complete the work within this time, the Government may, by written notice to the Contractor, terminate the right to proceed with the work (or the separable part of the work) that has been delayed. In this event, the Government may take over the work and complete it by contract or otherwise, and may take possession of and use any materials, appliances, and plant on the work site necessary for completing the work. The Contractor and its sureties shall be liable for any damage to the Government resulting from the Contractor's refusal or failure to complete the work within the specified time, whether or not the Contractor's right to proceed with the work is terminated. This liability includes any increased costs incurred by the Government in completing the work.

(b) The Contractor's right to proceed shall not be terminated nor the Contractor charged with damages under this clause, if—

(1) The delay in completing the work arises from unforeseeable causes beyond the control and without the fault or negligence of the Contractor. Examples of such causes include (i) acts of God or of the public enemy, (ii) acts of the Government in either its sovereign or contractual capacity, (iii) acts of another Contractor in the performance of a contract with the Government, (iv) fires, (v) floods, (vi) epidemics, (vii) quarantine restrictions, (viii) strikes, (ix) freight embargoes, (x) unusually severe weather, or (xi) delays of subcontractors or suppliers at any tier arising from unforeseeable causes beyond the control and without the fault or negligence of both the Contractor and the subcontractors or suppliers;

(R4, tab 28n at 1898; 48 C.F.R. § 52.249-10)

DECISION

At the outset, GSC is mistaken that *Wilner v. United States*, 24 F.3d 1397 (Fed. Cir. 1994), "does not apply to either appeal" (*see* app. br. at 29). Under *Wilner*, our review of these appeals is *de novo*, and the parties start before us on a clean slate. *See*

*id.* at 1402; *First Div. Design*, *LLC*, ASBCA No. 60049, 18-1 BCA ¶ 37,201 at 181,102.

A. *Is the termination justified?*

Under the default clause, here FAR 52.249–10(a), "[i]f the Contractor refuses or fails to prosecute the work or any separable part, with the diligence that will insure its completion within the time specified in this contract including any extension, or fails to complete the work within this time, the Government may, by written notice to the Contractor, terminate the right to proceed with the work (or the separable part of the work) that has been delayed." The government must prove by a preponderance of the evidence that a termination for default was justified; should the government justify the termination, the contractor must prove that the default was excusable. *CKC Sys., Inc.*, ASBCA No. 61025, 19-1 BCA ¶ 37,385 at 181,750.

The government says that the termination of the contract for default was justified because GSC did not meet the contract completion date (gov't br. in ASBCA No. 59402 at 5). Because GSC did not complete the work by the contract completion date of February 3, 2014, GSC defaulted; consequently termination for default was justified.[9] *See Truckla Serv.s, Inc.*, ASBCA Nos. 57564, 57752, 17-1 BCA ¶ 36,638 at 178,445. GSC does not say that the termination of its contract was a pretext, such that we might have to address the following, which we said in *Truckla*:

> In [*Darwin Constr. Co. v. United States*, 811 F.2d 593 (Fed. Cir. 1987)], the Federal Circuit held that a default termination that was done "solely to rid the Navy of having to further deal with" the contractor was an abuse of discretion, in circumstances where the reason given for the termination was found to be a pretext, which the court called a "technical default." 811 F.2d at 595. In the *McDonnell Douglas* A-12 aircraft litigation, the Federal Circuit clarified *Darwin*, explaining that the technical default theory bars only a termination for default in which there is "no considered nexus between the default termination and the contractor's performance under the

---

[9] During the hearing, the government suggested that it might rely upon labor violations allegedly committed by GSC to justify the termination, or, at least, that it was not ready to abandon any such position (*see* tr. 1/25). Because the government has not addressed any issue of labor violations in its post-hearing briefing, it has waived any contention that labor violations justify the termination. *See SmithKline Beecham Corp. v. Apotex Corp.*, 439 F.3d 1312, 1319 (Fed. Cir. 2006) ("arguments not raised in the opening brief are waived").

contract." Because in the A-12 termination, the government identified a nexus between the contractor's performance and the termination, the Court reversed a lower court decision overturning the termination.

17-1 BCA ¶ 36,638 at 178,445 (citing *McDonnell Douglas Corp. v. United States*, 182 F.3d 1319, 1326 (Fed. Cir. 1999)). Rather, the question here is whether the termination has a nexus to performance. It does: GSC failed to complete the work by the contract completion date. Because the government has established that GSC was in default, the termination of the contract for default is valid. *Aerospace Facilities Grp., Inc.*, ASBCA No. 61026, 20-1 BCA ¶ 37,668. For that reason, too, it is not necessary to address, at least not in this, the justification stage, whether the termination was the result of bad faith in the administration of the contract or in the issuance of the termination notice. *See id.* at 182,877-78.

### B. Did the contracting officer follow termination for default procedures?

The parties disagree whether the contracting officer properly considered the factors set forth in FAR 49.402-3(f) in deciding to terminate the contract for default (*see* gov't br. at 15-16; app. resp. at 16). That issue need not be decided. However a contracting officer arrives at a termination decision, the government may rely upon a contractor's failure to do its job to justify the termination of the contract for default. *Aerospace Facilities*, 20-1 BCA at 182,877; *HK&S Constr. Holding Corp.*, ASBCA No. 60164, 19-1 BCA ¶ 37,268 at 181,352 (citing cases); *aff'd*, 825 F. App'x 921 (Fed. Cir. Oct. 7, 2020) (per curiam, unpublished opinion); *see also Watts Constructors, LLC*, ASBCA No. 61518, 19-1 BCA ¶ 37,382 at 181,728 (citing and parenthetically quoting *HK&S* with approval).

### C. Did the government waive termination?

The parties disagree whether the government waived the contract completion date under *DeVito v. United States*, 413 F.2d 1147 (Ct. Cl. 1969) (gov't br. at 11; app. resp. at 26). Time is of the essence in any contract containing fixed dates for performance. Waiver is an affirmative defense that the contractor has the burden to prove. The waiver doctrine protects contractors whom the government leads to believe that time is no longer of the essence when allowed to continue substantial performance past a due date, under circumstances that justify a conclusion that the default has been excused. But waiver of default does not normally apply to construction contracts absent unusual circumstances. Essentially, waiver is only recognized in the case of such a default when the government manifests that it no longer considers the contract completion date enforceable. *Watts Constructors*, 19-1 BCA ¶ 37,382 at 181,727.

Absent "unusual circumstances" indicating that time is no longer of the essence, a reasonable forbearance from terminating a delinquent construction contract is not a waiver of the contract completion date. *Red Sea Engineers & Constructors, Inc.*, ASBCA No. 57448, 13 BCA ¶ 35,245 at 173,032. For example, there are no such "unusual circumstances" where the government has waited a few months to terminate a contract for default after having expressly reserved its termination rights, particularly where a contractor has provided optimistic reports encouraging forbearance rather than termination as the most expeditious way of completing the project. *Cf. id.* (four months of forbearance did not waive termination right). Nor does a contractor's work after a completion date indicate a waiver, particularly where it is against the backdrop of a government manifestation that it still considers that date to be the contract completion date. *See Watts Constructors*, 19-1 BCA ¶ 37,382 at 181,727.

GSC does not expressly identify any of the circumstances here as "unusual"; indeed, GSC does not use the term "unusual" at all in any of its post-hearing briefs, in any context. Rather, GSC argues that because "the government did not mention or assess liquidated damages," the government waived the construction contact completion date (app. resp. in ASBCA No. 59402 at 27). But in *Technocratica*, we said:

> [T]his Board has applied the waiver doctrine to construction contracts . . . where there is a manifestation by the government that it no longer considered the contract completion date enforceable. For example, . . . we held the waiver doctrine applicable where the government permitted the contract completion date to pass *without apparent concern*, the contractor continued to perform contract work, *and the government did not mention or assess liquidated damages*. Similarly, . . . the doctrine [is] applicable where the government permitted the completion date to pass *without taking any action*, did not unilaterally or bilaterally establish[] a new completion date, *and did not mention or assess liquidated damages*.

ASBCA No 47992 *et al.*, 06-2 BCA ¶ 33,316 at 165,186 (emphasis added). That discussion demonstrates that not mentioning liquidated damages is *not* enough to waive a construction contract completion date. Rather, what is important is whether the government acts as though time is no longer of the essence, *see AmerescoSolutions, Inc.*, ASBCA No. 56811, 10-2 BCA ¶ 34,606 at 170,550 (explaining *B.V. Constr.*, 04-1 BCA ¶ 32,604 at 170,550), especially where the government has expressed that it is not waiving its rights, *see Watts Constructors*, 19-1 BCA ¶ 37,382 at 181,727. As for the passage of time after a contract completion date, although nearly a year or more without termination may indicate that time is no longer

of the essence, *AmerescoSolutions*, 10-2 BCA ¶ 34606 at 170,550 (explaining *Technocratica* (10 to 13 months)), *B.V. Constr.* (two years)); here, only 135 days – fewer than five months – passed between the February 3, 2014 contract completion date and the June 20, 2014 termination date. *Cf. Watts Constructors*, 19-1 BCA ¶ 37,382 at 181,727 (seven months not a waiver). That does not indicate that time was no longer of the essence or that the government considered the contract completion date unenforceable, nor do the "continued work on the job and [] three pay applications" to which GSC points (app. resp. in ASBCA No. 59402 at 28).

Rather, the government indicated twice in the 135 days that passed between the February 3, 2014 contract completion date and the June 20, 2014 termination of the contract that time was still of the essence: (1) on February 24, 2014 (21 days after the contract completion date), the government expressly disavowed that it was waiving the contract completion date; and (2) on April 28, 2014 (84 days after the contract completion date and 63 days after expressly stating that it was not waiving the contract completion date), the government warned that the contract might be terminated for default. In any event, GSC says the January 16, 2014 order to show cause waived the contract completion date (app. resp. at 28). Nothing in that document waives the February 3, 2014 contract completion date; if anything, the language: "[a]ny assistance given to you on this contract or any acceptance by the Government of delinquent goods or services will be solely for the purposes of mitigating damages, and it is not the intention of the Government to condone any delinquency or to waive any rights the Government has under the contract" preserved the government's right to completion by February 3, 2014. GSC points (app. resp. at 28) to R4, tab 6, but that document is a February 24, 2014 letter from the government that says, in deciding not to terminate the contract "at this time," "this in no way constitutes a waiver of the contract's original completion date," and "[t]he Government looks forward to your firm meeting the commitments outlined in your response, including completion by June 9, 2014." And on April 28, 2014, the government sent GSC another order to show cause, which says that the "[c]urrent required construction completion is February 3, 2014." Although the April letter does not include the language "this in no way constitutes a waiver of the contract's original completion date" found in the February letter, and although the April letter refers to "the revised completion date of June 9, 2014," the April letter's language that the "[c]urrent required construction completion is February 3, 2014" and "it is not the intention of the Government to condone any delinquency or to waive any rights the Government has under the contract" preserved the February 3, 2014 contract completion date.

In addition, although Mr. Kloeckler waited 135 days after the contract completion date to terminate the contract, he advised GSC a little more than two weeks before the contract completion date that the completion date was February 3, 2014, and that the government did not intend to waive any rights under the contract, and then, weeks after the February 3, 2014 contract completion date, advised GSC that

he was not waiving the contract completion date. *Cf. Abcon Assocs., Inc.*, 44 Fed. Cl. 625, 631 (1999) (no waiver; government notified contractor that it did not intend to waive right to terminate for default). Again in April 2014, after the contract completion date passed, Mr. Kloeckler reiterated that the contract completion date remained February 3, 2014. In addition, Mr. Kloeckler terminated the contract only nine days after the June 9, 2014 date by when GSC had said (months earlier, after the contract completion date had passed) that it could complete the work.

Moreover, GSC provided to the government optimistic reports encouraging forbearance rather than termination as the most expeditious way of completing the project. Responding to the government's January 16, 2019, order to show cause stating that it was "considering terminating the contract," GSC wrote to the government four days later that it would timely complete the project "according to all contract requirements including time extensions," that it could complete the contract work by June 9, 2014, that the government consult with GSC's counsel before taking any further action toward termination, and that termination would not be necessary because GSC was "confident that we will meet your needs and timely complete the contract according to the contract requirements and commitments in this letter." And on March 10, 2014, a month after the February 3, 2014 contract completion date, GSC wrote to the government that GSC concurred that termination was not warranted, and looked forward to working with the government on the remainder of the project.

*Patten Co.,* ASBCA No. 35319, 89-3 BCA ¶ 21,957, which GSC relies upon in support of its waiver argument (app. resp. br. in ASBCA No. 59402 at 31), does not involve a construction contract. GSC complains that the government did not partner with it to meet the June 9, 2014 proposed completion date (app. resp. br. ASBCA No. 59402 at 30), but even if true, that would not indicate a waiver of the February 3, 2014 contract completion date. For all these reasons, the *DeVito* waiver doctrine does not apply to this construction contract, and even if it did, the government did not waive the February 3, 2014 contract completion date.

However, if the government did waive the February 3, 2014 contract completion date, it established a new contract completion date: June 9, 2014. Pointing to Mr. Kloeckler's testimony that he did not establish a new contract completion date, GSC says that the government never established a new contract completion date (app. resp. in ASBCA No. 59402 at 30). After waiving a contract completion date, the government cannot terminate a contract for default based upon a contractor's failure to make progress with or complete the contract work unless it reaches agreement on a new completion date with the contractor or establishes by specific notice a new completion date, which is reasonable based on the contractor's performance capabilities at the time that date is established. *Technocratica*, 06-2 BCA ¶ 33,316 at 165,188. The April 28, 2014 order to show cause says: "GSC Construction has also failed to make satisfactory progress towards completing the

project in accordance with *the revised completion date of June 9, 2014* as indicated in your firms' [sic] response to the Governments first Show Cause notice dated January 24, 2015" (emphasis added). That is a direct reference to GSC's position on completion: on January 28, 2014, GSC told the government that "[w]e will timely complete this project according to all contract requirements including time extensions," and that "GSC feels confident that it can complete the project by June 9, 2014." Assuming for the sake of decision that the government waived the February 3, 2014 contract completion date, the government re-established a new contract completion date of June 9, 2014, which GSC also failed to meet; the government terminated the contract only 11 days after that "revised" date, on June 20, 2014.

After February 3, 2014, the government continued to view time as of the essence, and never waived the February 3, 2014 contract completion date. GSC's *DeVito* waiver argument is rejected.

### D. Did GSC fail to make satisfactory progress?

The government also raises the issue whether "termination for default based on failure to make satisfactory progress was appropriate" (gov't br. in ASBCA No. 59402 at 3). That question need not be answered. Where, as here, the delivery date has passed, any termination constitutes termination for failure to meet a performance deadline, not for failure to make progress. *See Abcon*, 44 Fed. Cl. at 631. Only if excusable delay extended a contract completion date beyond a contract termination date would failure to make progress toward the extended contract completion date become an issue. Because (below) I find no such excusable delay, I do not address further whether GSC "failed to make progress."

### II. Is the default excused?

### FINDINGS OF FACT

### A. GSC's subcontractors

Both before and after the termination, GSC wrote to some it its subcontractors on the project, blaming them for problems including delay of the project, termination of the contract for default, and monetary losses to GSC. I find those statements admissions against GSC's interest, and, based upon those admissions, find that subcontractors to GSC delayed the project, causing the termination for default and millions of dollars in monetary losses to GSC.

44

*1. Mitchell Acoustics*

GSC blamed Mitchell Acoustics, which GSC contracted to erect and install exterior structural studs, interior studs, sheetrock, and insulation (tr. 5/20, 8/213, 260), for causing the termination of the contract for default by delaying the work, and informed Mitchell Acoustics that it had caused in excess of $2.1 million in losses to GSC (*see* R4, tab 179n at 1). On September 24, 2014, GSC wrote to Mitchell Acoustics through Mr. Phillips, GSC's then-vice-president:

> This letter is to inform you that GSC's contract was terminated on the SSA contract. We have been investigating the cause behind this and it appears that this was due to lack of progress by Mitchell Metals.[10] This has resulted in excess of $2.1 million in losses. As in accordance with our subcontract, GSC requests mediation and arbitration to resolve this matter as soon as possible. GSC requests your response by 10/1/14 and how you intend to pursue.

(R4, tab 179n) Mr. Phillips testified at the hearing but never testified regarding this letter (tr. 6/227-39), even though Mr. McKnight (who also did not testify regarding that letter) testified regarding GSC's efforts "to speed performance of [Mitchell Acoustic's] work," including meeting with Mitchell Acoustics "to increase their manpower" (tr. 5/26, 6/15). Along the same lines, on June 9, 2014, GSC's then-project manager Mr. Cundey wrote to Mitchell Acoustics that:

> I need to know what the plan is for making up for lost production time. I can understand cutting the crew if you they [sic11] are not producing but you also told me you would have another crew of qualified individuals on Monday. This did not happen. I do not think the answer is to use a 8 man crew and take equipment off of the project. I need a completion dates and another crew on-site yesterday. Framing and sheathing need to be going on concurrent to make up for loss production time. Please have these answers to me by the end of the day.

---

[10] I take this unexplained reference to "Mitchell Metals" to refer to Mitchell Acoustics.
[11] As will be seen, Mr. Cundey's correspondence is rife with punctuation, spelling, and grammar anomalies, too many to signal with the convention "[sic]" without unduly distracting the reader; thus, I will bring almost no further attention to them.

45

(R4, tab 179l; tr. 8/166-67)  Later the same day, Mr. Cundey wrote to Mitchell Acoustics that:

> Mitchell Acoustics has now been on this project for (5) weeks.  The original timeline discussed to complete the exterior studs on the 168th was (15) working days or (3) weeks.  At this point in time we are not even half way complete with the studs and not even a quarter of the way complete with the sheathing.  I personally discussed these issues with you last week and you stated you understood and felt that personnel issues were the cause of the problem.  At that time you went from having 16 employees on-site to 8 employees.  You also stated that as of Monday I would have two experienced crews on-site to work the 168th and 100th buildings concurrently.  As of today there are still 8 employees on-site and the production they are making is a joke.  The 6 individuals you had on-site Saturday accomplished more production with less people.
>
> I am trying to keep from writing your company directives per the subcontract agreements or procuring another company to complete the other building and deduct their contract amount from your subcontract agreement.  Therefore I am once again asking you what is the plan to make up for loss time.  If the individuals you have on-site now are the experienced crew you mention last week then we have a major problem.  They are making far less production than when you had 16 people and even making less production than the 6 individuals that worked this Saturday.  I am extremely concerned and perplexed about the lack of urgency.
>
> Please have a plan of action by the end of the day or I will be forced to take other measures.

(R4, tab 179i)  The next day, Mr. Cundey wrote to Mitchell Acoustics:

> GSC has expressed our concerns regarding lack of production verbally and via email correspondence.  GSC has gone above and beyond trying to help Mitchell overcome manpower and production issues.  Mitchell Acoustics has now fallen (2) weeks behind the original completion date for the 168th exterior studs and is at least

(3) weeks behind on the 100th exterior studs. The original duration that was given for GSC for the exterior studs was 15 days. Mitchell has now been on site for 21 days and is not even half way completed with the 168th building and the 100th building has barely started. Sheathing has barely started in the 168th and has not started at all in the 100th. Mitchell Acoustics will need to almost double the current crew to make up for the slow production.

Per Article 4.1.8.1 of the subcontract agreement, GSC is informing Mitchell that if additional manpower is not on-site no later than 6-11-14 that GSC will be forced to procure additional forces. All cost for such additional forces shall be deducted from the Mitchell's contract amount. I will also require completion dates for exterior and interior metal stud walls by the end of the day.

(R4, tab 179m) At the hearing, Mr. Cundey (who by the hearing no longer worked for GSC (tr. 8/75)) confirmed that Mitchell Acoustics "was not properly manning the project" and that "the time it was taking Mitchell to frame and sheath was unacceptable" (tr. 8/225, 228). Based upon those admissions, I find that Mitchell Acoustics delayed the project, caused the termination for default, and caused GSC to lose $2.1 million.

### 2. *TTG Electric*

In September 2014, GSC blamed TTG Electric Co., Inc. (TTG), which GSC had contracted for various electrical and lighting work on the project (R4, tab 183a at 15, 29-30), for causing the termination of the contract for default and more than $2.4 million in losses to GSC by delaying the work (*see* R4, tab 183j at 1). On September 16, 2014, Mr. McKnight wrote to TTG:

GSC has reviewed the events leading up to termination and believe one of the delays was attributed to TTG Electric. TT[G] violated its contract with GSC by delaying the submittals and approval of the electrical panels on this project. It worked without GSC's knowledge to develop site lighting with the infrastructure contractor. Once the power requirements was known, it misled GSC leading to revision to the electrical requirements and request for self-inflicted change order. Basically, TTG worked with [the government] and infrastructure contractor without GSC's knowledge to place site electrical loads in the warehouse

47

area without GSC's knowledge and the knowledge that GSC's limits of responsibility were 10' outside building limits.

It is clear TTG played a key role in 6-1/2 Month delay in this project and termination by GSC for lack of progress. GSC requests to be compensated $2,453,000.00 for its losses. GSC demands mediation and arbitration to resolve this matter as dictated by Article 6 of the executed contract.

(R4, tab 183j)  Mr. Phillips wrote virtually the same thing to TTG on September 25, 2014 (R4, tab 183k).  Along the same lines, on March 31, 2014, Mr. Cundey wrote to TTG on behalf of GSC:

I need to speak with the individual who made the decision to abandon the project first thing this morning. . . .  I am directing TTG to have individuals on-site no later than 9:00am.  Abandoning the project is not the way to handle disputes.

R4, tab 183i  Based upon those admissions, I find that TTG delayed the project, caused the termination for default, and caused GSC to lose $2,453,000.  Despite these many communications, at the hearing Mr. McKnight said that he had blamed TTG because, he said, he "had limited information at that time" and "did not know all the facts"; even so, he did not disclaim the contents of his letter (*see* tr. 5/207-09).

### 3.  Steel Resources

According to GSC's own communications, another subcontractor, Steel Resources, LLC, which GSC had contracted to design, supply, and install "all steel, purlins, decking, metal roof, roof insulation, gutters, soffit, fascia and downspouts" for the SSA project (R4, tab 185d at 1, 10), delayed the project by failing to properly staff the project, and by engaging in a slowdown or shutdown over a payment dispute with GSC (*see e.g.*, R4, tab 185s at 1-4; tr. 6/194).  In November 2013, Mr. Cundey wrote to Steel Resources:

As per our conversation today and in the past we where scheduling start erection of warehouse during completion of slabs on the other area ,per your schedule erection steel is app 2 weeks .  We discussed 2 crews as both steel erection could accrue within two weeks apart . As of today

we have no erectors on site ,no erector crew is scheduled to be on site as you stated did not have a agreement with crews as of today to start or continue . Further more crews on site have major issues with payrolls that may effect GSC pay request on activities completed to date . We need to discuss ,payrolls and manpower available to start and complete activities as need . One crew with 4 labors is unacceptable . *Does GSC need to find erector to continue activities next week ?*

R4, tab 185q at 1 (emphasis added)  Days later, GSC wrote to Steel Resources:

> GSC is informing Steel Resources that the continuous issues with erection crews *are seriously delaying the project schedule*.  At this time Steel Resources has no erection crews on site and GSC has not received any type of safety documents on the new erection crew.  GSC is informing [Steel Resources] that if erection crews are not on site on Monday, 25, GSC intends on following the subcontract agreement to acquire outside forces to complete Steel Resources' scope of work.

R4, tab 185u at 1 (emphasis added)  Only days after that, GSC wrote to an attorney for Steel Resources:

> Please inform your client *due to delays on this project and not manning the project*, this is notification he is in violation of Article 3.4.3 and GSC is taking steps under Article 3.4.  GSC further feels it has notified and suffered sufficient delays to execute Article 7.2 of the contract and seeks damages as allowed by these articles. . . .  It is GSC's hope that you will convey to your client to complete his contract in a timely manner so losses can be minimized and every one can get paid.

R4, tab 185w at 1-2 (emphasis added)  On November 19, 2013, GSC wrote to Steel Resources that Steel Resources had "no grounds per contract for non performance and intentional delay of project and should be held liable for delays and cost," and stated that "GSC is demanding mediation and arbitration per contract to resolve" (R4, tab 185s at 1-2).  On December 2, 2013, Mr. McKnight wrote to Steel Resources:

> As clearly outlined by Article 11.1 of Steel resources signed executed contract Steel resources is to get paid as

49

GSC gets paid. I cannot help that Steal resources billed for material not onsite "insulation" now "trim" and the user does not warrant payment of Steel Resources invoice. *Article 11 and 4.7 further clearly states that Steel Resources is not to delay project for disagreements on payment.* GSC has also suffered damages do to your violations of Article 3.2 of the executed contract of which need resolution .

GSC has demanded mediation and Arbitration required by Article 6 of which I have received no response. We need to firm up a date so the all disagreements can be resolved to avoid any additional delays and cost can be avoided. If you refuse to agree to a date and arbitrator by Wednesday, GSC will be forced to enforce article 7.2 of the contract and hold accountable for any additional cost. . . . It is my hope that you will work with GSC to try and finish your contract work as soon as possible.

(R4, tab 185aa at 1) (emphasis added) On December 11, 2013, Mr. McKnight again wrote to Steel Resources:

It is my understanding that Brad called up our erector and threatened him. *So he has abandoned the project and we are once again without an erector. This goes against our agreement to work with this erector and get MBCI paid. GSC has rented an great amount of equipment and Steel resources will be held accountable for this and delay cost.*

*I also understand that Brad has also tried to sabotage the project by giving false information on concrete.* As u can see from the attached picture of columns standing. This also goes against our agreement that Brad would not talk to COE and would be taken off job.

. . .

Thus unless I hear something to prove this is incorrect today and u intend complete your contract. *I will make my attorney very rich to make u pay for doing what u did to GSC.*

(R4, tabs 177 at 2547, 185cc) (emphasis added) Mr. Knight also wrote:

50

> GSC will experience *great unnecessary losses* completing
> your contract work. It is clear by your actions, "
> Demanding Errectors to leave Project" *Steel resources had*
> *no intentions of completing this project.* I will let my
> attorneys explain this and why [*Steel Resources*]
> *abandoned project.* I have instructed gsc attorney to get us
> into mediation ASAP and then arbitration *so GSC can*
> *recover losses.*

(R4, tabs 177 at 2546, 185dd at 1) (emphasis added) Mr. McKnight testified regarding that letter that he was "trying to motivate [Steel Resources] to perform" (tr. 6/111), and denied that problems with Steel Resources abandoning the project were "one of the significant reasons why [GSC] was experiencing delays" (tr. 6/113-14). Nevertheless, based upon those admissions, I find that Steel Resources delayed the project and caused GSC monetary losses.

### 4. Other, internal issues, and issues with other subcontractors

GSC was delayed by other issues, both internal and with other subcontractors. In December 2013, Mr. McKnight wrote that it would "take another 10 months to complete" the project, citing that GSC had "not even completed concrete," and had "4 [quality control] people on this project and only 60% of submittals complete after 1 year" (R4, tab 177 at 2532). In December 2013, Mr. McKnight blamed GSC's superintendent, Mr. Reeves, for GSC's problems with submittals:

> I am very disappointed by your actions. I clearly explained
> to you all to get the info submitted and approved and not
> rely any contractors. If it changed we would resubmit.
> But u still look for excuses to not get the job completed.
> Example "we have no contractor for cmu".
> Scott completed all submittles on project in six months. U
> have ben on this project for 10 months and have not
> completed 50%. I would suggest you help scott to help u
> get out of this mess.

(R4, tab 177 at 2734) On December 18, 2013, GSC blamed a company named "Boatwright" for delays to submittals (R4, tab 177 at 2777). On February 20, 2014, GSC wrote to Division Counsel of a company referred to as "MBCI":

> As you are aware, GSC has encountered several issues
> while erecting the PEMB that were supplied by your

51

company.  GSC indicated to MBCI that building components shipped were mislabeled, fabricated incorrectly, or not shipped at all.  To date MBCI refuses to address any of the issues with the PEMB steel.  The following is an estimated cost for the deficient or outstanding building components.

1) 168th and 100th building all holes were fabricated incorrectly to allow the cross bracing for the walls to pass through the columns.  The holes were ¾" and the bracing is 1-1/4".  GSC is having to drill out with a mag drill.  $8,000.00.

2) 168th and 100th building column line (1-2) missing G-8 spandrel beam, column line (1-2) missing G-1 spandrel beam, column line (B-C) missing spandrel beam G-11, column line (F-E) missing spandrel beam G-10.  GSC having to have AISC certified welding shop fabricate missing steel and deliver to site.  $10,000.

3) On grid line L-5 in both buildings the column plate was installed in the wrong direction.  GSC having to take steel to a AISC certified welding shop and then bring back to site$5,000.00.

4) Wrong size diameter bolts provided at wind girt locations.  GSC having to purchase bolts through Fastenal.  $1,500.00.

5) 168th and 100th building extension components fabricated incorrectly that are identified as EB-4.  The mounting plate does not match up to the column bolting pattern.  GSC having to take steel to a AISC certified welding shop and then bring back to site.  $5,000.00.

GSC has requested MBCI to correct deficiencies of which have been we have been directed that MBCI will not correct any deficiencies.  GSC has been forced to use other forces to correct in order to minimize delays.  MBCI has also refused to provide detailed invoices on items provided or legibly mark any materials provided.  GSC requests MBCI come to the jobsite to review.  GSC provided a check to MBCI less 10% of total billed amount until onsite

material could be verified. Now it appears GSC's worse fears in that *deficiencies and missing material provided by MBCI are in effect causing delays and increased costs*.

(R4, tab 177 at 3312-13) (emphasis added) On March 7, 2014, Mr. Reeves wrote to Mr. McKnight:

> Govt dies [sic] not have to request my removal, I will leave tomorrow . I knew this was heading down this way and of course *I will need to be the fall guy from scheduling steel erection to other activities even though no contractor are available*.

(R4, tab 177 at 3535) (emphasis added) On April 4, 2014, Mr. McKnight wrote to Mr. Cundey:

> U just approved 11k bill for last week to steve Hendrix. GSC also has another 10k bill for our people working last week on panels. Total payment is 21k for three panels to be installed. *I am directing u and your staff to give me a detail time sheet of what that person did every day every hour. We have spent over 200k getting up the two buildings steel. This has got to get under control.* Does Jacob he has any responsibility? He needs to know he is just not responsible for quality but we are looking at him and you for the overall health of the project.

(R4, tab 177 at 3858) (emphasis added)

On May 21, 2014, Mr. Cundey wrote to Mr. McKnight and to Knight Architects, GSC's design firm:

> The design build group is holding the project hostage and creating several issues for my [field] staff. What I cannot understand is that several of the issues are CA items that Knight's is billing for and has not completed. I have mention to Joe on several occasions that the LEED issues on both projects are becoming a serious with the COE and they are holding money until complete. The LEED issue for the CIF and SSA is not just some small deal. The COE will not . . . release withholdings for the SSA until the website is set up and data entered. When I talked to Joe last I informed him that the LEED website data had not

been started at all for the SSA. . . . No site visits have been made for the SSA over the duration of the project. (thought this was a part of CA fees) It appears that DOR missed the PEMB coordination with the exterior walls.

(R4, tab 177 at 4606) Knight Architects wrote back, under the subject line "Knight Architects refusal to work for no money!":

> As I have said, I would have been happy to visit the site, but it is your construction site and we don't just show up. . . . As you know, we have billed you at 50% completion for the Construction Administration. After this, GSC will still owe us $5,555 per our conversation on March 21 (an explanation of which was included in the email I sent you last Friday at 2:26 PM), $500 on our original design fee plus the remaining $23,000 on our CA fees. The difficulty we have had in the past with getting paid by GSC doesn't encourage me to gamble our professional time on your work; we have completed an extensive amount of effort on Construction Administration and have no indication that you are planning to pay us! We, like you, need to be paid for our work.

(R4, tab 177 at 4611) Mr. Cundey replied:

> I am just making everyone aware that what is included in the CA fees is not complete. The government will not release remaining monies on the CIF project until the LEED documentation is corrected and re-submitted. My LEED APP has been requesting this information for over 7 months from Knights. The government is now withholding money on the SSA project for the LEED documentation that was suppose[d] to be entered into the website during the 100% design over a year ago. It appears that you are billing for design requirements that have not been completed. *Holding this project hostage when there are outstanding items on your end included in this billing is just going to hold up the outstanding monies longer.*

(R4, tab 177 at 4610) (emphasis added) Knight Architects replied: "Okay- I will look into it. I was not aware that the LEED Documentation you mentioned is 7 months overdue until just now. Can you forward me one of the memos you have received on

54

this?" (R4, tab 177 at 4610)  Mr. Cundey reacted to Knight Architect's response by writing to Mr. McKnight:  "I am at my wits end.  Please resolve" (R4, tab 177 at 4616).

## 5.  Expert opinions

### a.  Mr. McAfee, GSC's Delay Expert

According to Mr. McAfee, GSC's delay expert, (1) construction to the building pad was delayed 65 days (tr. 7/75); (2) a "fire water flow test" was delayed 22 days (tr. 7/94-95); and (3) "cold form metal framing" was delayed 134 days (tr. 7/106). During the hearing, Mr. McAfee did not opine on any delay to "Electrical Design No. 3" (tr. 7/8-159).[12]  In support of Mr. McAfee's opinion, GSC entered into the record as demonstrative exhibits eight "windows" that Mr. McAfee created (demo. exs. 58-65; tr. 7/59-108).  In "Window 0" (WIN00), Mr. McAfee used the government-approved schedule as his baseline, and added to that schedule some federal holidays that had been omitted from the schedule (tr. 7/59-61; demo. ex. 58). That schedule shows the critical path through the project as the parties saw it on the windows data date, September 26, 2012, before any work was started (demo. ex. 58; tr. 7/67).  It shows a start date of September 26, 2012; a finish date of January 29, 2014; a data date of September 26, 2012; and a run date of July 5, 2015 (demo ex. 58). It shows (1) the notice to proceed issued on September 26, 2012; (2) the 100th building pad as the first critical activity (depicted as a red bar (tr. 7/62)), starting on September 26, 2012, finishing ("ready") on January 24, 2013, and labeled "Infrastructure prepare Bldg Pads 100th"; and (3) exterior wall framing 168th becoming critical on September 3, 2013, and finishing on September 16, 2013 (*id.*).  It does not identify a "fire water flow test" as an activity, critical or otherwise (*id.*).

Window 1 (WIN01) shows the critical path through the project as of March 7, 2013 (demo. ex. 59; tr. 7/69).  It shows a start date of September 26, 2012; a finish date of April 9, 2014; a data date of March 7, 2013; and a run date of July 5, 2015 (demo. ex. 59).  It shows (1) the 100th building pad still on the critical path as of March 7, 2013, starting on September 26, 2012, finishing ("ready") on April 10, 2013, and labeled "Infrastructure prepare Bldg Pads 100th"; (2) exterior wall framing 100th becoming critical on October 15, 2013 and finishing on October 26, 2013; (3) interior wall framing 100th becoming critical on November 16, 2013, and finishing on December 6, 2013; (4) exterior wall framing 168th becoming critical on November 18, 2013, and finishing on December 2, 2013; and (5) interior wall framing 168th

---

[12] GSC has clarified that "[t]he Board need not address the Design Revision 3 delay," calling it a "non-driving delay" (app. br. in ASBCA No. 59601 at 2, 37); accordingly, GSC has abandoned any claim based upon "the Electrical Design No. 3 delay."  *See SmithKline Beecham*, 439 F.3d at 1320-21.

becoming critical on December 3, 2013, and finishing on December 19, 2013 (*id.*). It does not identify a "fire water flow test" as an activity, critical or otherwise (*id.*).

Window 2 (WN02) shows the critical path through the project as of May 9, 2013 (demo. ex. 60; tr. 7/78). It shows a start date of September 26, 2012; a finish date of July 1, 2014; a data date of May 9, 2013;[13] and a run date of July 5, 2015 (demo. ex. 60). It shows (1) the 100th building pad still on the critical path as of May 9, 2013, starting on April 16, 2013, and finishing ("ready") on July 15, 2013; and labeled "COE DIRECTS GSC – BUILD PADS"; (2) exterior wall framing 168th becoming critical on February 18, 2014, and finishing on March 1, 2014; and (3) interior wall framing 168th becoming critical on March 3, 2014, and finishing on March 19, 2014 (*id.*). It does not identify a "fire water flow test" as an activity, critical or otherwise (*id.*).

Window 3 (WIN03) shows the critical path through the project as of July 11, 2013 (demo. ex. 61; tr. 7/84). It shows a start date of September 26, 2012; a finish date of July 7, 2014; a data date of July 11, 2013; and a run date of July 9, 2015 (demo. ex. 61). It shows (1) the building pads on the critical path as of July 11, 2013, starting on July 13, 2013, finishing with respect to the 100th ("ready") on July 18, 2013; and labeled "GSC Continues BUILD PADS"; (2) exterior wall framing 168th becoming critical on February 22, 2014, and finishing on March 5, 2014; (3) interior wall framing 168th becoming critical on March 6, 2014, and finishing on March 22, 2014 (*id.*). It does not identify a "fire water flow test" as an activity, critical or otherwise (*id.*).

Window 4 (WN04) shows the critical path through the project as of August 8, 2013 (demo. ex. 62; tr. 7/89). It shows a start date of September 26, 2012; a finish date of July 18, 2014; a data date of August 8, 2013; and a run date of July 9, 2015 (demo. ex. 62). It shows (1) the 100th building pad finished ("ready") as of August 8, 2013; and (2) exterior wall framing 168th becoming critical on March 4, 2014, and finishing on March 17, 2014 (*id.*). It does not identify a "fire water flow test" as an activity, critical or otherwise (*id.*).

Window 5 (WN05) shows the critical path through the project as of November 13, 2013 (demo. ex. 63; tr. 7/93). It shows a start date of September 26, 2012; a finish date of August 9, 2014; a data date of November 13, 2013; and a run date of July 9, 2015 (demo. ex. 63). It shows a "flow test" becoming critical on October 25, 2013, and finishing February 28, 2014, and labeled as "FLOW TEST DELAY: WATERLINE REPLACEMENT BY OTHERS" (*id.*). Mr. McAfee added

---

[13] Mr. McAfee explained that the data date is "a schedule update provided by the contractor with the dates of actual performance agreed to by the parties" (tr. 7/79; *see* tr. 7/82).

the activity "COE DIRECTS GSC – BUILD PADS" to the schedule (tr. 7/128). The February 28, 2014 finish date is "a guess into the future" on the part of Mr. McAfee (tr. 7/129). According to Mr. McAfee, the fire flow test delay had no effect on the erection of structural steel (tr. 7/132).

Window 6 (WN06) shows the critical path through the project as of January 4, 2014 (demo. ex. 64; tr. 7/97). It shows a start date of September 26, 2012; a finish date of October 6, 2014; a data date of January 4, 2014; and a run date of July 9, 2015 (demo. ex. 64). It shows (1) exterior wall framing 100th becoming critical on March 27, 2014, and finishing on April 15, 2014; (2) interior wall framing 100th becoming critical on May 5, 2014, and finishing on May 21, 2014 (*id.*). It shows a "flow test," labeled as "FLOW TEST DELAY: WATERLINE REPLACEMENT BY OTHERS," unfinished but no longer critical as of January 4, 2014 (*id.*). Mr. McAfee explained that because of Window 6A, Window 6 can be ignored (tr. 7/108).

The final window, Window 6A (WN06A), shows the critical path through the project as of January 4, 2014, incorporating a "design basis threat" produced by the government after Mr. McAfee submitted his schedule analysis (demo. ex. 65; tr. 7/101, 103, 141). It shows a start date of September 26, 2012; a finish date of December 21, 2014; a data date of January 4, 2014; and a run date of September 19, 2015 (demo. ex. 65). It shows (1) "COE REVIEW DELAY COLD FORMED METAL FRAMING," becoming critical on January 4, 2014, and finishing on May 6, 2014; (2) exterior wall framing 100th becoming critical on June 7, 2014, and finishing on June 26, 2014; and (3) interior wall framing 100th becoming critical on July 17, 2014, and finishing on August 2, 2014 (*id.*).

Mr. McAfee provided the following answers to the following questions:

> Q [Y]our methodology is susceptible to manipulation due to modeling if only one party's delays are considered, since the method cannot account for the impact of delays not explicitly inserted. Do you agree with that?
>
> A To the extent that the other party's delays are not in the schedule, yes.

(Tr. 7/34)

Mr. McAfee also said the following:

> Q And it's your testimony that the critical path shifted to fire protection in October of 2013. Is that correct?

A Yes.

(Tr. 7/130)  In addition, Mr. McAfee would not agree that in order to be compensable, a delay would have to be on the critical path (tr. 7/117).

Mr. McAfee also answered the following:

> Q Okay. If you go to page 81 of this document, several caveats are described, and Ms. Darr quoted one in her questioning of you. How did you take into account these caveats when performing your analysis?
>
> A Well, the first one, because it does not rely on as-built data, it's hypothetical. What I did for the delays is to go into the record to establish what the project record said about various things. So when I would come up with a date, it would be based upon what's actually in the record or estimation of durations for remaining activity, which is based upon professional judgment, estimation, experience, years of experience.

(Tr. 7/48)

Mr. McAfee also answered the following:

> MS. DARR: Okay.
>
> THE WITNESS:  I believe you asked if I added activities. Was that it?
>
> BY MS. DARR:
>
> Q  You added activities?
>
> A  I think you asked me if I added activities.
>
> Q  Yes. Did you?
>
> A  Yes, because the delays were not allowed to be presented contemporaneously in the schedule.
>
> Q  Okay.

A  So I put them in there.

(Tr. 7/40; *see also* tr. 7/120-21, 128-29, 133-35, 138, 153)

### b.  Mr. Ockman, the Government's Delay Expert

According to Mr. Ockman, (1) the project was delayed 85 days by the late submittal of the "foundation/civil design package"; 96 days by late submittal of an acceptable contractor quality control plan; 105 days by late finish of "100th Warehouse footing/slab on grade"; and 68 days by slow progress with "100th Warehouse metal building erection"; for a total of 354 days (demo. exs. 11 at 52, 12 at 3-4; tr. 4/67-131).  Also according to Mr. Ockman, (1) at the time of termination on June 18, 2014, the project was less than half finished; (2) it took GSC four months to submit its foundation design, compared to the five weeks in its proposal schedule; (3) it took seven months to place the foundation concrete, compared to the ten weeks that GSC originally planned; (4) once "the 100th warehouse" foundation was ready for metal building erection, it took five months to erect the framing, roof panels, and sheathing, part of that projected, versus the eleven weeks originally planned; and (5) GSC would not have completed the project until sometime around August 2015 (*see* tr. 4/93).

On cross-examination, Mr. Ockman admitted that (1) in adjusting GSC's proposed schedule by changing the notice to proceed (NTP) date from the May 2012 date that GSC used to the actual September 2012 notice to proceed date, he did not make any separate adjustment "for weather days based on an NTP starting in September instead of May"; (2) he input the activities that he found critical, and not "the exact activities from GSC's schedule"; (3) he didn't have any cost-loading or resource-loading information for the initial, proposed project schedule, even though resource-loading information "tells [one] the resources [one] need[s] to dedicate to each activity," and didn't add either cost-loading or resource-loading to his "revised or recreated" schedule; (4) his schedule does not show "the pad being turned over" on January 24, 2013, even though "you have to finish the building pad before you can do foundations"; (5) "if the pad is getting turned over 120 days after NTP, we would go 120 days from September 26, 2012," to January 24, 2012; (6) a 1999 article he co-wrote states "[h]ypothetical impacted as-planned network delay analysis which do not take into account actual events on the project as they evolve are unacceptable methods to evaluate the impact of project delays," (7) the same article states "[t]he logic network necessarily must reflect a plan that takes into account physical contraints, preferential logic, and commitment of a certain level of resources"; (8) his proposal schedule "doesn't have any resources in it"; (9) the same article states "CPMs that do not include reasonable resource leveling and appropriate logic constraints are unrealistic and do not provide a basis for evaluating project delays"; (10) the recreated proposed schedule that he used as the basis for his analysis doesn't have any resource leveling; and (11) "there

59

is no logic restraint in [his] recreated proposal schedule [] for the [] building pad turnover" (tr. 4/147-64). Mr. Ockman attempted to distance himself from the statement in the article that he co-wrote that "CPMs that do not include reasonable resource leveling and appropriate logic constraints are unrealistic and do not provide a basis for evaluating project delays," by claiming that "that portion was written by" his co-author, and that he (Mr. Ockman) "would not have written it the way [his] co-author wrote it" (tr. 4/161-62).

On cross-examination, Mr. Ockman also admitted (11) that the article he co-wrote states, referring to "the importance of looking at the logic behind a schedule," that "[f]requently, these schedules appear to be in excellent condition from the outside. However, a detailed examination often exposes a flawed, if not useless, schedule . . . . [t]he predictable result is that this information is not available in print on the majority of projects today. This means that the logic underlying most schedules today is hidden from all project participants unless they work directly with the computer"; (12) his opinion in these appeals is the first that he remembers "using a proposal schedule to analyze a job"; (13) another article he wrote states, referring to an approved schedule, "[o]nce a reasonable as-planned schedule has been approved, it becomes the benchmark for measuring contractor and owner performance on the project"; (14) he "didn't use the approved schedule to analyze GSC's claims"; that same article states "[w]ith a proper scheduling specification, the approved schedule becomes a benchmark for assessing the contractor's performance throughout the project"; (15) the schedule specification for the project is a reasonable scheduling specification; (16) his article states that the approved schedule "is the basis for negotiating equitable time extensions for changes and owner-caused delays, and thus, vital for determining equitable compensation for delay damages . . . [a]s the benchmark for measuring performance, the schedule also becomes the owner's most effective tool or weapon for keeping the project on schedule"; (17) he didn't use the approved schedule; (18) his article states "[i]f a contemporaneous original progress schedule was prepared and particularly if the original progress schedule was approved by the owner, the original progress schedule, with appropriate adjustments to make it reasonable, if required, becomes the reasonable as-planned schedule"; (19) he didn't take the approved schedule and make adjustments to that schedule; (20) his article states "[t]he reasonable as-planned schedule is the benchmark for measuring the impact of subsequent changes or delays," and that is because "whatever the reasonable as-planned schedule is, that's what forms the foundation for your analysis"; (21) he ran his analysis using the approved schedule after being deposed regarding his expert report, without revising his expert report; (22) the recreated proposed schedule that he used as the basis of his analysis has 80 activities, whereas GSC's proposed schedule had about 150 activities, and the approved schedule had 342 activities; (23) the activity descriptions in his recreated proposed schedule do not match the activity descriptions in the approved schedule; (24) "[i]f there's not an exact activity match for erecting the building structure, then there's no way to track progress unless you assume other activities cover the proposal work"; (25) he hadn't "done an analysis of the impact of GSC having to design

60

a building pad"; and (26) he did not make any adjustment "to the schedule to take into account a monolithic pour" of the kind used when installing a "Wafflemat" slab (which slab GSC proposed for the project (tr. 4/254)) (tr. 4/165-84).

On cross-examination, Mr. Ockman also admitted that (27) he did not include any delayed fire protection in his analysis; (28) he opined in his report that GSC poured concrete on November 20, 2013, before there was an approved submittal; (29) he did not look at how long the cold-formed metal framing submittal took to get approved; and (30) he did not give time to GSC for roof panels that were damaged by another government contractor (tr. 4/192-93, 198, 203).

Mr. Ockman has received a mixed reaction from this Board. In *John C. Grimberg Co.,* ASBCA No. 58791, 18-1 BCA ¶ 37,191 at 181,041, the government employed Mr. Ockman; there, the Board found that "a considerable portion of Mr. Ockman's analyses" was "fundamentally flawed" and in other respects "without merit." In *Curry Contracting Co.,* ASBCA No. 53716, 06-1 BCA ¶ 33,242 at 164,748, the Board found Mr. Ockman's analysis "generally to be correct." Here, the many discrepancies recited above that were elicited by the cross-examination of Mr. Ockman make his opinion unreliable, unhelpful, and not credible. Of them, two are the most devastating. First, Mr. Ockman failed to employ a methodology that he co-wrote was essential to a delay analysis: the use of an approved, as-planned schedule. *Accord* THEODORE J. TRAUNER ET AL., CONSTRUCTION DELAYS 16, 44 (1990) ("The analyst must carefully choose the schedule that best represents the project as-planned schedule. . . . If the Contractor submits the schedule a second and third time until it is finally accepted by the Owner, chances are that the third schedule submission best represents the as-planned schedule for the Project. . . ."). Second, he attempted to lay that discrepancy at the feet of his co-author.

## DECISION

By way of excuse for its default, GSC claims entitlement to 321 days of excusable delay (258 days of which GSC says are compensable), that it says result in an extended contract completion date of December 21, 2014, some six months after the termination of the contract, based upon three discrete alleged delays: (1) a 165-day delay to the "building pad" (165 days excusable, 160 days compensable); (2) a 22-day delay to the "fire water flow test" (all excusable and compensable); and (3) a 134-day delay to "cold form metal framing" (134 days excusable, 76 days compensable) (app. resp. in ASBCA No. 59402 at 33; app. br. in ASBCA No. 59601 at 2, 34, 37). GSC's delay claims total $328,293.82 in site overhead expenses for the 252 days of allegedly compensable delay at a rate of $1,302.75 per day (app. br. at 2; tr. 1/38).

## A. Standards for Evaluating Delay Claims

The critical path is the longest path in the schedule on which any delay or disruption would cause a day-for-day delay to the project itself; those activities must be performed as they are scheduled and timely in order for the project to finish on time. *Wilner v. United States*, 23 Cl. Ct. 241, 245 (1991). In *Yates-Desbuild Joint Venture*, CBCA No. 3350 et al., 17-1 BCA ¶ 36,870, our sister board compiled an excellent and very helpful synopsis of the standards for evaluating delay claims, which I adopt nearly verbatim among the discussion that follows.

To the extent that the government that delays a contractor's work and increases its costs, the contractor may seek compensation for its damages. Yet, the mere fact that there is some delay to some aspect of planned contract work is not enough to establish that the contractor's ultimate contract performance costs or time increased. In evaluating the effect of government-caused delays on the contractor's ultimate performance time and cost, tribunals generally look to the critical path of contract performance, a method of delay analysis that the United States Court of Claims explained as follows:

> Essentially, the critical path method is an efficient way of organizing and scheduling a complex project which consists of numerous interrelated separate small projects. Each subproject is identified and classified as to the duration and precedence of the work. (E.g., one could not carpet an area until the flooring is down and the flooring cannot be completed until the underlying electrical and telephone conduits are installed.) The data is then analyzed, usually by computer, to determine the most efficient schedule for the entire project. Many subprojects may be performed at any time within a given period without any effect on the completion of the entire project. However, some items of work are given no leeway and must be performed on schedule; otherwise, the entire project will be delayed.

*Yates-Desbuild*, 17-1 BCA ¶ 36870 at 179,684-85 (quoting *Haney v. United States*, 676 F.2d 584, 595 (Ct. Cl. 1982)).

Where the time frame for performance of an activity, set by the earliest possible start time and the latest possible finish time, establishes a time interval equal to the expected activity duration, the activity is termed "critical," and no discretion or flexibility exists in the scheduling of that activity. Items of work for which there is no timing leeway are on the critical path, and a delay, or acceleration, of work along the

critical path will affect the entire project. Specifically, then, to prevail on its claims for the additional costs incurred because of the late completion of a fixed-price government construction contract, a contractor must show that the government's actions affected activities on the critical path. Typically, if work on the critical path is delayed, then the eventual completion date of the project is delayed. Conversely, a government delay that affects only those activities not on the critical path does not delay the completion of the project. As a result, the determination of the critical path is crucial to the calculation of delay damages. *Id.* at 179,685.

To satisfy its burden, the contractor must establish what the critical path of the project actually was and then demonstrate how excusable delays, by affecting activities on the contract's critical path, actually impacted the contractor's ability to finish the contract on time. This is done through an analysis to show the interdependence of any one or more of the work items with any other work items as the project progressed. One established way to document delay is through the use of contemporaneous Critical Path Method (CPM) schedules and an analysis of the effects, if any, of government-caused events. In fact, in situations where the contractor utilized Primavera scheduling software to create schedules throughout the life of the project, it would be folly to utilize some other method of critical path analysis. *Id.*

Because the critical path of construction can change as a project progresses, activities that were not on the original critical path subsequently may be added, and, to preclude post hoc rationalization and speculation, it is important that the contemporaneous schedules that the contractor uses to show critical path delay are updated throughout contract performance to reflect changes as they happened. Accurate, informed assessments of the effect of delays upon critical path activities are possible only if up-to-date CPM schedules are faithfully maintained throughout the course of construction. *Id.*

Nevertheless, the existence of contemporaneous schedules does not permit a tribunal to ignore, or fail to consider, logic errors in those schedules. A CPM schedule, even if maintained contemporaneously with events occurring during contract performance, is only as good as the logic and information upon which it is based. CPM is not a "magic wand," and not every schedule presented will or should be automatically accepted merely because CPM technique is employed. To be a reliable basis for determining delay damages, a CPM schedule must reflect actual performance and must comport with the events actually occurring on the job. Tribunals may need to inquire into the accuracy and reliability of the data and logic underlying the CPM evaluation in appropriate circumstances and reject CPM analyses if the logic was not credible or was suspect. *Id.* at 179,685-86.

Even if the contractor shows delay by the government that affects the critical path, the contractor must also establish that it was not concurrently responsible for

delays. Tribunals will deny recovery where the delays of the government and the contractor are concurrent and the contractor has not established its delay apart from that attributable to the government. Nevertheless, any contractor-caused delays must affect the critical path of contract performance to be considered "concurrent" — contractor delays that, absent the Government-caused delay, would have had no negative impact upon the ultimate contract completion date do not affect the government's monetary liability. For the same reasons discussed above, because concurrent delays that do not affect the critical path of contract work do not delay project completion, an accurate critical path analysis is essential to determine whether concurrent delays have caused delay damages related to the delayed completion of a complex construction project. *Id.* at 179,686.

In establishing excusable delay, the contractor may point to causes outside the Government's control. FAR 52.249-10(b)(1), Default, provides a non-exhaustive list of excusable delays that includes acts of God, acts of a host country government in its sovereign capacity, fires, floods, epidemics, strikes, and unusually severe weather.[14] Obviously, a contractor has no control over whether it rains, whether there is a flash flood, or whether there are forest fires. Nevertheless, the mere fact that a delay is caused by a type of activity listed in the contract as generally excusable does not give the contractor carte blanche to rely upon such excuses. The purpose of the proviso, which is to protect the contractor against the unexpected, and its grammatical sense both militate against holding that the listed events are always to be regarded as unforeseeable, no matter what the attendant circumstances are. A quarantine, or freight embargo, may have been in effect for many years as a permanent policy of the controlling government and, if so, may not meet the definition of a cause "unforeseeable" at the time of contract award, even if quarantines and freight embargoes are listed in the contract as examples of possible excusable causes of delay. *Id.* at 179,686-87.

---

[14] In its July 3, 2014 complaint, GSC alleges that "[t]he Government has not addressed any of GSC's correspondence concerning weather delays. Requests for a total of 49 weather days are currently pending" (July 3, 2014 compl. at 13 ¶ 49). During the hearing, GSC also pointed to weather delays, as well as "hairpin" delays (tr. 1/26, 1/29, 1/47-48). Although the record contains evidence that weather precluded work on some days, GSC's post-hearing briefing does not attempt to quantify that delay or to demonstrate how that delay affects the outcome of these appeals. The Board does not do an appellant's work for it. *SKE Base Servs. Gmbh*, ASBCA No. 60101, 18-1 BCA ¶ 37,159 at 180,903 ("We won't do appellant's work for it.").

Further, even if an unforeseeable cause of delay occurs, the contractor cannot sit back and fail to take reasonable steps in response to it — once such an unforeseeable event occurs, the contractor affected by it has an obligation to attempt to mitigate the resulting damage to the extent that it can. If the contractor fails to do so, it may not recover those damages which could have been avoided by reasonable precautionary action on its part. *Id.* at 179,687.

To establish entitlement to an extension based on excusable delay, a contractor must show that the delay resulted from "unforeseeable causes beyond the control and without the fault or negligence of the Contractor," and the unforeseeable cause must delay the overall contract completion; i.e., it must affect the critical path of performance. *Sauer Inc. v. Danzig*, 224 F.3d 1340, 1345 (Fed. Cir. 2000). Similarly, a contractor's default is excused only to the extent that there were no additional delays for which the contractor was responsible (beyond those caused by the government) and that "there is in the proof a clear apportionment of the delay and the expense attributable to each party." *See Blinderman Constr. Co. v. United States*, 695 F.2d 552, 559 (Fed. Cir. 1982) (quoting *Coath & Goss, Inc.*, 101 Ct.Cl. 702, 714-15 (1944).

However, in order to prove that it is entitled to delay damages in the form of time or money, a contractor must prove that the government was responsible for specific delays, overall project completion was delayed as a result of the government-caused delays, and any government-caused delays were not concurrent with delays within the contractor's control. *L.C. Gaskins Constr. Co.*, ASBCA No. 58550 *et al.*, 18-1 BCA ¶ 36,978 at 180,121-22. If an event that would constitute an excusable cause of delay in fact occurs, and if that event in fact delays the progress of the work as a whole, the contractor is entitled to an extension of time for so much of the ultimate delay in completion as was the result or consequence of that event, notwithstanding that the progress of the work may also have been slowed down or halted by a want of diligence, lack of planning, or some other inexcusable omission on the part of the contractor. *Chas. I. Cunningham Co.*, IBCA No. 60, 57-2 BCA ¶ 1,541 at 5,843.

A contractor is entitled to time extensions for government-caused delays and excusable delays, even when they are concurrent with contractor-caused delay. When a contractor is seeking extensions of contract time, for changes and excusable delay, which will relieve it from the consequences of having failed to complete the work within the time allowed for performance, it has the burden of establishing by a preponderance of the evidence not only the existence of an excusable cause of delay but also the extent to which completion of the contract work as a whole was delayed thereby. The contractor must prove that the excusable event proximately caused a delay to the overall completion of the contract, i.e., *that the delay affected activities on the critical path*. And it must also establish the extent to which completion of the work was delayed—it is entitled to only so much time extension as the excusable

cause actually delayed performance. *R.P. Wallace, Inc. v. United State*s, 63 Fed. Cl. 402, 409-10 (2004).

Thornier issues are posed by concurrent or sequential delays—the first occurring where both parties are responsible for the same period of delay, the second, where one party and then the other cause different delays seriatim or intermittently. Concurrent delay is not fatal to a contractor's claim for additional time due to excusable delay, but precludes the recovery of delay damages. If a period of delay can be attributed simultaneously to the actions of both the Government and the contractor, there are said to be concurrent delays, and the result is an excusable but not a compensable delay. A contractor generally cannot recover for concurrent delays for the simple reason that no causal link can be shown: A government act that delays part of the contract performance does not delay the general progress of the work when the prosecution of the work as a whole would have been delayed regardless of the government's act. *Id.*

## B. Did GSC's subcontractors cause the termination?

As the government points out (gov't brief in ASBCA No. 59402 at 9, 26-28; gov't resp. in ASBCA No. 59601 at 26) but GSC's briefing ignores, in September 2014, GSC wrote to three of its subcontractors – Mitchell Acoustics, TTG, and Steel Resources – blaming them for its problems. GSC accused Mitchell Acoustics of causing the default termination by delaying the work, and of causing GSC $2.1 million in losses. It accused TTG of playing a "key role" in the delay of the project and the termination of the contract, and blamed TTG of causing $2,453,000 in losses to GSC. It accused Steel Resources of "seriously delaying the project schedule," of abandoning the project, and of causing monetary losses to GSC.

Even before September 2014, GSC had been complaining to its subcontractors about their performance, and non-performance, and about the delays they were causing to progress on the project. In March 2014, GSC accused TTG of "[a]bandoning the project." In June 2014, GSC accused Mitchell Acoustics of "lost production time," "tak[ing] equipment off of the project," of being "not even half way complete with the studs and not even a quarter of the way complete with the sheathing," and of having employees on-site whose production was "a joke." GSC said of Mitchell Acoustics in June 2014 that "[i]f the individuals you have on-site now are the experienced crew you mention last week then we have a major problem," and confessed that it was "extremely concerned and perplexed about the lack of urgency." In June 2014, GSC accused Mitchell Acoustics "manpower and production issues," of having "fallen (2) weeks behind the original completion date for the 168th exterior studs and is at least (3) weeks behind on the 100th exterior studs," of being "not even half way completed with the 168th building," and pointed out that "the 100th building has barely started," predicting that "Mitchell Acoustics will need to almost double the

current crew to make up for the slow production." Indeed, Mr. Cundey confirmed in his testimony that Mitchell Acoustics "was not properly manning the project" and that "the time it was taking Mitchell to frame and sheath was unacceptable."

In November 2013, more than six months before the termination, GSC accused Steel Resources of understaffing the project, and that erection crews were "seriously delaying the project schedule," and having "no erection crews on site," and threatened "to acquire outside forces to complete Steel Resources' scope of work." In December 2013, GSC accused Steel Resources of causing damages to GSC by violating its contract, reminded an attorney of Steel Resources that the contract "clearly states that Steel Resources is not to delay project [sic] for disagreements on payment," and expressed its hope that the attorney "will work with GSC to try and finish your contract work as soon as possible." Also in December 2013, GSC accused Steel Resources of "abandoning the project," told Steel Resources that GSC had "rented [a] great amount of equipment," and promised that Steel Resources would "be held accountable for this and delay cost." GSC even accused Steel Resources of having "tried to sabotage the project by giving false information." GSC promised that unless Steel Resources proved that it would "complete [the] contract," it would "make [GSC's] attorney very rich to make u pay for doing what u did to GSC," accused Steel Resources of having "had no intentions of completing [the] project," and that GSC had instructed its attorney to get GSC "into mediation ASAP and then arbitration so GSC can recover losses."

The above-referenced communications from GSC to Mitchell Acoustics, TTG, and Steel Resources are admissions, against GSC's interest, that those subcontractors delayed GSC's progress on the project and caused GSC monetary loss, and, based upon those admissions, I find that those subcontractors caused the termination of the contract for default and, together, more than $4,553,000 in losses to GSC. *See generally Raytheon Co.*, ASBCA No. 57743, 16-1 BCA ¶ 36,335 at 177,147 (distinguishing between evidentiary admissions and judicial admissions). *Cf. Reliable Contracting Grp. v. Dep't of Veterans Affairs*, 779 F.3d 1329, 1334-35 (Fed. Cir. 2015) (contractor's contemporaneous admissions were probative evidence that generators did not comply with the contract; citing cases)*; ITT Gilfillan Div.*, ASBCA No. 37834, 92-1 BCA ¶ 24,490 at 122,227-28 (statement in Turkish Air Force report that radar was "operational but degraded" was admission against interest proving radar was capable of passing contractually-required operational test); *Milam Builders, Inc.*, ASBCA No. 29700, 85-1 BCA ¶ 17,709 at 88,376 ("Appellant has claimed $1,573 although its evidence did not establish this amount; accordingly, the amount estimated by the Government will be considered an admission against interest. Appellant is therefore entitled to $1,542."); *Phillips Constr. Co.,* ASBCA No. 5831, 70-2 BCA ¶ 8,363 at 38,893 ("The testimony of 75 days delay was therefore in the nature of an admission against interest or at least in diminution of appellant's principal case."); *Larco-Indus. Painting Corp.*, ASBCA No. 14647, 73-2 BCA ¶ 10,073 at 47,325 ("In an admission against interest, Mr. Parks before his departure on 11 December 1969

from Fort Chaffee told Mr. Roberts that respondent had as much of a problem with personnel as did the contractor (app. ex. No. 47; para. 7, *supra*). We accept his appraisal.").

Mr. McKnight's efforts to distance himself from the contents of his letter to TTG with protestations of "limited information" are not persuasive. Mr. McKnight wrote that letter after GSC submitted to Mr. Kloeckler a claim blaming the government for delaying the work, and contemporaneously with GSC filing complaints in these appeals also blaming the government. Moreover, the contemporaneous correspondence, much of it authored by Mr. McKnight himself, demonstrates that GSC was well aware of what was happening on the project. As early as December 2013, Mr. McKnight knew enough to predict that it would "take another 10 months to complete" the project, citing that GSC had "not even completed concrete," and had "4 [quality control] people on this project and only 60% of submittals complete after 1 year" (R4, tab 177 at 2532). Nor can GSC claim "limited information" with respect to its admissions regarding delays caused by Steel Resources; GSC knew enough to go to an attorney, who evidently had enough information as early as December 9, 2013, to write to Steel Resources to demand mediation and arbitration. By contrast to Mr. McKnight, Mr. Cundey made no effort to distance himself from his contemporaneous criticism of Mitchell and TTG, essentially confirming and reiterating his opinion that, in 2014, Mitchell's work had been unacceptable and behind schedule, and TTG had abandoned the project.

In September 2014, nearly two years before the hearing, GSC blamed its subcontractors for delaying the work and, therefore, causing the termination of the contract. That is a significant admission against GSC's interest, which is presumptively dispositive of this issue and unrebutted: GSC's subcontractors caused GSC's default, making GSC responsible for that default, which is, therefore, not excused. *See Snyder v. Dravo Corp.*, 6 F.R.D. 546, 553 (W.D. Pa. 1947) (admission against interest created presumption of entitlement in favor of opponent); *see, e.g.*, *Blake Constr., Co.,* ASBCA No. 36307, 90-2 BCA ¶ 22,889 at 114,941 ("the Government's focus on a particular letter and particular terminology therein is too narrow and isolated. It is more appropriate to examine the entirety of the claim letter, and to do so in the context of all events including the earlier correspondence referenced therein. . . . *An 'admission against interest' by a party may not be conclusive proof but a rebuttable presumption, subject to additional evidence.*") (emphasis added); *W.G. Yates & Sons Constr. Co.*, ASBCA No. 49398, 01-2 BCA ¶ 31,428 at 155,192 nn. 2-3 ("For continuity and as an admission against interest we cite the amount claimed by Yates in its brief as the equitable adjustment claimed."); *Daly Constr., Inc.*, ASBCA No. 32457, 87-3 BCA ¶ 20,182 at 102,151 ("while the contract administrator's letter may not bind the Government contractually to the indicated time extension, it is a significant admission against interest of the Government. This admission is sufficient by itself to establish Daly's prima facie

entitlement to the indicated extension, shifting to the Government the burden of showing that its contract administrator's assessment was not correct. The Government has failed to meet that burden."); *Maxwell Dynamometer Co.*, ASBCA No. 5974, 61-1 BCA ¶ 2,896 at 15,129 ("The 'regular 1960 price list' referred to in the above quotation is simply a 'Price Schedule' and does not appear to impinge on the suggestion of the Government that the contractor's brochure constitutes an admission against interest that it is commercially feasible to offer to the public a Chassis Dynamometer capable of absorbing 275 horsepower up to 90 miles per hour notwithstanding the unit is equipped with 8 1/2″ rollers."); *Fluor Corp.,* ASBCA No. 13166, 69-1 BCA ¶ 7,626 at 35,418 ("Thus we find full support for the subcontractor's estimate of manhours expended for these changes and purchase orders and there stands as an admission against interest the 1,000 hours attributed to other Fluor purchase orders."). *See also*, *Fairfield Science Corp.*, ASBCA No. 21151, 78-1 BCA ¶ 13,082 at 63,911 (Watkins, Bayus, A.J.J., dissenting, concerning admission under oath and quoting C.J.S. § 382: "If voluntarily made, and distinct and unequivocal, admissions against interest are taken or presumed to be true, and dispense with the necessity of any other proof of the fact admitted, although it does not render other proof of the fact incompetent."); *Morganti Nat'l, Inc. v. United States*, 49 Fed. Cl. 110, 135 (2001), *aff'd*, 36 F. App'x 452 (Fed. Cir. 2002) (finding that subcontractor's departure had a significant time impact on contractor's ability to perform in a timely manner, and noting that contractor "admitted as much" in response to order to show cause, in which contractor stated: "Given the very significant scope and critical path nature of the work covered by [subcontractor's] contract . . . a severe impact to our progress as a result of that abandonment was unavoidable"); *Parsons Evergreene*, LLC, ASBCA No. 58634, 18-1 BCA ¶ 37,137 at 180,814 (denying contractor's delay claim where contractor's expert did not address comment in the contemporaneous notes that activity was no longer on the critical path). *Cf. Gulf Contracting, Inc.*, ASBCA No. 30195 *et al.*, 89-2 BCA ¶ 21,812 at 109,759, *aff'd*, 23 Cl. Ct. 525 (1991) (concluding that problems with subcontractor and subcontractor's quality control and workmanship problems contributed significantly to the late completion and increased cost of the project); *aff'd*, 972 F.2d 1353 (Fed. Cir.) (table) (June 5, 1992).

In addition, GSC's statements on this issue undermine the credibility of its current positions. GSC has blamed both its subcontractors and the government for delaying the work and causing the termination for default. In other examples of shifting positions, in November 2013, Mr. McKnight wrote to Steel Resources, accusing it of liability for "delays and cost," and demanding "mediation and arbitration per contract to resolve." Then, during the hearing in 2017, Mr. McKnight deflected regarding that letter, testifying that he was "trying to motivate [Steel Resources] to perform." Similarly, in December 2013, Mr. McKnight wrote to Steel Resources that "GSC will experience great unnecessary losses completing your contract work. I will let my attorneys explain this and why [Steel Resources] abandoned [the] project,"

threatening to "make [his] attorney very rich to make [Steel Resources] pay for doing what [Steel Resources] did to GSC." Then, testifying in 2017, Mr. McKnight denied that problems with Steel Resources abandoning the project were "one of the significant reasons why [GSC] was experiencing delays." In addition, in December 2013, GSC understood that it would take another ten months–that is, until October 2014–to complete the project, but in January 2014, only a month later, GSC told the government that it "feels confident that it can complete the project by June 9, 2014."[15]

---

[15] The government has its own credibility issues in these appeals. In a remarkable move, government counsel elicited from Mr. Adams, another contractor to the government (a construction manager), testimony that ended with Mr. Adams slurring Mr. McKnight from the witness stand with the characterization that Mr. McKnight was "a cross between a cheap thug and a used car salesman." Although GSC uses Mr. Adams's slur as the banner of one of its briefs (app. resp. at 1), the government's use of Mr. Adams to slur Mr. McKnight like that takes one aback (*see* tr. 4/234). *NXIVM Corp. v. O'Hara*, 241 F.R.D. 109, 114 n.5 (N.D.N.Y. 2007); *cf. Martin Oboler*, 61-1 BCA ¶ 3,085 at 16,009.

Also regarding the credibility of the government's presentation, another government witness, Mr. Braghini, testified to what he agreed "wasn't a very flattering opinion of GSC's scheduling ability," even though he had earlier testified in a deposition that he had no personal opinion on GSC's performance, and even though he testified that he hadn't changed his mind between his deposition and testimony before this Board (*see* tr. 2/95-96). The government's attempts to rehabilitate Mr. Braghini on that point were ineffective, particularly in view of his further deposition testimony that "I really can't make an opinion of [appellant's] scheduling abilities."

In addition, the government evidently expects us to accept that its tagging certain Fort Sill projects (including two of GSC's) with the moniker "The Magnificent Seven" had "no special significance" and meant nothing at all (Mr. Owens, who coined the phrase, unpersuasively testified that "[t]here was no meaning" to it), much less nothing disparaging and not an ironic and sarcastic criticism, even though the government viewed those projects as its "most significant challenges" regarding "late completion of projects" and were either "late or projected to be late." Given that "The Magnificent Seven" is an iconic 1960 movie depicting seven gunslingers who come to the aid of a town beleaguered by bandits, *see The Magnificent Seven*, INTERNET MOVIE DATABASE, https://www.imdb.com/title/tt0054047/, the government's benign explanations are not persuasive, and its efforts to avoid the obvious here (*see* gov't reply at 15 & n.27 (citing testimony) & n.28) are not credible.

Returning to GSC's correspondence to its subcontractors, the presumption raised by those admissions that the subcontractors delayed the work and caused GSC's default stands unrebutted. Mr. Phillips testified but never addressed the letter he wrote, and Mr. McKnight testified but did not disavow his unequivocal 2014 admission that TTG "violated its contract with GSC by delaying the submittals and approval of the electrical panels on this project."[16] Moreover, although each party presented an expert's delay opinion, I credit neither, and reject both.

GSC says that "[t]he Board should adopt the findings of Richard McAfee, finding his opinion exhibits the best analysis for GSC's time related claims" (app. br. at 31). Mr. McAfee's "windows" methodology is at least similar to, if not the same as, that accepted by the United States Court of Federal Claims in *George Sollitt Constr. Co. v. United States*, 64 Fed. Cl. 229, 252 (2005):

> The better methodology for a critical path delay analysis is to use the updated CPM schedules, not the baseline schedule prepared before construction began. . . . [T]he court will favor [the analysis that] estimated each critical path delay by inserting a delaying event into the CPM schedule update closest in time to the alleged delaying event.

However, as the trier of fact, the Board is not bound by expert testimony. *See Sw. Marine, Inc. San Pedro Division*, ASBCA No. 28196, 86-2 BCA ¶ 19,005, at 95,980; *U.S. Eng'g Co.*, ASBCA No. 28835, 84-2 BCA ¶ 17,305 at 86,241. *Gulf Contracting*, 23 Cl. Ct. at 529 n.1. Mr. McAfee does not address any of the glaring issues with GSC's performance; namely, the several problems that GSC identified with the performance of three of its subcontractors (Steel Resources, Mitchell Acoustics, and TTG), problems that GSC evidently saw as so grave that it expressly and specifically blamed two of those subcontractors (Mitchell Acoustics and TTG) for the termination of its contract for

---

The government also called to the stand a former GSC employee, Mr. Veltema, whom GSC successfully impeached with his prior inconsistent statement under oath on whether a certain GSC QC manager, Jacob Reeves, "could function independently as QC manager" given that GSC's project manager, Randy Reeves, was the father of Jacob Reeves. At the hearing, Mr. Veltema answered that question in the negative; he immediately admitted that at his deposition he had answered in the affirmative.

[16] Indeed, GSC pointed the finger of blame for delays to the project in many other directions as well, blaming Mr. Reeves, Boatwright, MBCI, weather, the hairpin delay, and Knight Architects.

default, and demanded millions of dollars in compensation from the same two subcontractors. *Cf. Gulf Contracting, Inc.*, ASBCA No. 30,195 *et al.*, 89-2 BCA at 109,759 (rejecting expert's analysis as unreliable because it "systematically excluded all delays and disruptions except those allegedly caused by the Government," which "was inherently biased, and could lead to but one predictable outcome."); *aff'd by* 23 Cl. Ct. 525 (1991), *aff'd*, 972 F.2d 1353 (Fed. Cir. 1992) (finding "[s]everal factors impair the credibility of [expert's] analysis, including that "although [expert's] analysis purports to separate government-responsible delays from contractor-responsible delays, it fails to assign values to contractor-responsible delays," and that "[expert's] treatment of contractor-responsible disruptions to barracks work is not persuasively addressed by either his testimony or the [expert] report"). Furthermore, Mr. McAfee reviewed GSC's complaints in these appeals before he performed his analysis; he knew the delays that GSC was alleging before he began that analysis, and his analysis identifies the same delays that GSC claims in these appeals (tr. 7/142-43). That congruence makes Mr. McAfee's objectivity suspect. *Cf. E. Minerals Int'l, Inc. v. United States*, 39 Fed. Cl. 621, 627 (1997) ("The testimony and conclusions of one expert clearly were designed to mesh with the Government's legal theories. His refusal to acknowledge input from counsel in reaching his conclusions was not credible."), *judgment rev'd on other grounds, appeal dismissed sub nom. Wyatt v. United States*, 271 F.3d 1090 (Fed. Cir. 2001); *Mega Constr. Co. v. United States*, 29 Fed. Cl. 396, 433-34 (1993) (discerning "a strong partisan position by [expert] in favor of plaintiff, in conflict with one of his duties as an expert witness to objectively assist the court to understand the facts and issues").

The analysis of a party's expert that systematically excludes all disruptions except those allegedly caused by the party's opponent, capable of leading to but one predictable outcome, is inherently biased and totally unreliable; to be credible, a contractor's CPM analysis ought to take into account, and give appropriate credit for, all of the delays alleged to have occurred. *Gulf Contracting*, 89-2 BCA ¶ 21,812 at 109,759 (finding that contractor failed to assign values to contractor-responsible delays); *George Sollitt*, 64 Fed. Cl. at 276 (rejecting claims for additional expenses for the exterior masonry where even if contractor had proved that unreasonable delays by the Navy delayed exterior masonry work, contractor did not prove that the Navy-caused delays were the sole proximate cause of the delayed start to this work, where contemporaneous documents showed in contractor's procurement of structural steel, which also would have delayed the exterior masonry work, and contractor had not apportioned the delays affecting the exterior masonry work, and the record before the court lacked the specificity and certainty that would make apportionment feasible). Here, GSC has admitted that its subcontractors caused the default by delaying its performance, and a contractor is responsible for the unexplained failures of its subcontractors. *See Williamsburg Drapery Co. v. United States*, 369 F.2d 729, 742 (Ct. Cl. 1966); *United Schools of America, Inc.*, ASBCA No. 38628, 90-3 BCA ¶ 23,199 at 116,426.

Indeed, the government specifically relies upon GSC's admissions (gov't br. in ASBCA No. 59402 at 7-9, 27; gov't resp. in ASBCA No. 59601 at 21); by contrast, not only does Mr. McAfee not take them into account, GSC makes no real effort to address them, not even by citing the GSC September 2014 letters upon which the government relies (*see* app. resp. at 37). *Cf. United States Army Corps of Engineers v. John C. Grimberg Co.*, 817 Fed. App'x 960 (Fed. Cir. June 9, 2020) (table) (noting that appellee did not respond to appellant's legal contention, and holding, therefore, that appellee's "failure to contend with the required legal test is fatal to its claim"); *Sauer Inc. v. Danzig*, 224 F.3d at 1346 (affirming Board rejection of delay claims, and pointing with approval that the Board noted that contractor's "contemporaneous letters of complaint make no mention of difficulties encountered specific to crane rail work"); *Morganti*, 49 Fed. Cl. at 124, 138, 148 (upholding termination for default and quoting contractor's criticism of subcontractor's work that "[a]ny further delays in the delivery of the remaining panels will have a disastrous effect on our construction schedule"), *aff'd*, 36 F. App'x 452 (Fed. Cir. 2002) (per curiam, unpublished opinion); *Curry Contracting Co.,* ASBCA No. 53716, 06-1 BCA ¶ 33,242 at 164,748 (criticism of delay analysis included that expert "did not consider alleged contractor delays"); *PCL Const. Services, Inc. v. United States*, 47 Fed. Cl. 745, 803-04 (2000) (rejecting contractor delay claims and pointing to internal contractor document substantiating delays attributed to subcontractor); *Hoffman Const. Co. of Or. v. United States*, 40 Fed. Cl. 184, 199 (1998), *aff'd in part, rev'd in part on other grounds*, 178 F.3d 1313 (Fed. Cir. Jan. 22, 1999) (unpublished decision) (rejecting contractor delay claims and pointing to "other potential causes of delay for which the government is not responsible," including subcontractor-caused delays). Mr. McAfee's delay analysis is rejected.

Mr. Ockman's opinion also fails to address whether GSC's subcontractors caused delays and the termination for default, but the failure to do so by Mr. McAfee stands out including because GSC itself points out that "a CPM analysis "must 'take into account, and give appropriate credit for, all of the delays which were alleged to have occurred" (app. br. at 30 (quoting *Galaxy Builders, Inc.*, ASBCA No. 50018, 00-2 BCA ¶ 31,040)). Indeed, we have said that to be credible a contractor's CPM analysis ought to take into account, and give appropriate credit for all of the delays which were alleged to have occurred. *Gulf Contracting*, 89-2 BCA ¶ 21,812 at 109,759; *Pathman Constr. Co.*, ASBCA No. 23392, 85-2 BCA ¶ 18,096 (rejecting CPM analysis with "built-in bias").

The purpose of an expert opinion is to help the trier of fact. *See Parsons-UXB Joint Venture*, ASBCA No. 56481, 12-1 BCA ¶ 34,919 at 171,695. Presumably, the Board is not comprised of delay experts, but laypersons on that subject, otherwise there would be no need for, and we would not entertain, the opinions of delay experts, much as is the case with respect to experts who might "offer" legal opinions. *See id.*

at 171,695 ("Expert testimony pertaining to issues of law is inadmissible."). Although we are to weigh both the expert and other testimony and evidence, we are not obligated to adopt any particular conclusion or opinion reached by an expert witness, even if uncontradicted. *Reflectone, Inc.*, 98-2 BCA ¶ 29,869 at 147,829. And we are free to reject expert testimony that we find intrinsically unpersuasive. *Id.* Moreover, the Board may rely upon its own common sense. *See id.* (parenthetically explaining *Gulf Contracting, Inc.*, ASBCA No. 30195 *et al.*, 90-1 BCA ¶ 22,393 at 112,521).[17] *Cf. Morganti*, 49 Fed. Cl. at 133 (deferring to parties' pre-litigation schedule agreement, despite testimony from both sides' experts that was at odds with that agreement). Here, neither Mr. McAfee's nor Mr. Ockman's help is ultimately needed, because we have GSC's admissions, which neither expert addresses, despite the substantial evidence in the record that there were problems with how GSC's subcontractors performed – or failed to perform – their work. For example, there is evidence that TTG, Mitchell Acoustics, and Steel Resources may have been malingering. Steel Resources abandoned the worksite at least once (evidently over disputes with GSC over payment and concrete deficiencies): on one occasion Steel Resources told GSC that Steel Resources "will not erect steel on the referenced slab without evidence of authorization to proceed with erection from the appropriate engineer of record and Corps of Engineers project administrator." And a dispute between TTG and GSC prompted TTG to abandon the work on March 31, 2014: GSC demanded that TTG make available "the individual who made the decision to abandon the project," and complained to TTG that "[a]bandoning the project is not the way to handle disputes." There is also evidence–again, from the pen (so to speak) of GSC– that Mitchell Acoustics did not staff the job properly and had, in GSC's own words, "manpower and production issues" and would "need to almost double the current crew to make up for the slow production." On June 9, 2014 (which, ironically but perhaps not coincidentally was the date by which, months earlier, GSC had forecast it would complete the work), GSC wrote to Mitchell Acoustics, a little more than a week before the termination, that:

> Mitchell Acoustics has now been on this project for
> (5) weeks. The original timeline discussed to complete the
> exterior studs on the 168th was (15) working days or
> (3) weeks. At this point in time we are not even half way
> complete with the studs and not even a quarter of the way
> complete with the sheathing. . . . The 6 individuals you
> had on-site Saturday accomplished more production with
> less people. . . . If the individuals you have on-site now are
> the experienced crew you mention last week then we have

---

[17] The Civilian Board of Contract Appeals has also expressed these views, citing our opinion in *Reflectone*. *All Star Metals, LLC*, CBCA No. 53, 09-1 BCA ¶ 34,039 at 168,355-56.

a major problem. They are making far less production than when you had 16 people and even making less production than the 6 individuals that worked this Saturday. I am extremely concerned and perplexed about the lack of urgency.

GSC unequivocally accused Mitchell Acoustics of causing a ripple effect of delay (emphasis added): "I am sorry to take this stance but Mitchel acoustics *is now delaying other subcontractors because of slow production*." The point is that Mr. McAfee and GSC make no effort to account for the evidence that at least some delays were caused by GSC's own subcontractors – delays that GSC determined were the cause of the termination. It is not up to us to do GSC's work and sort out who delayed what specific activities and to what extent. *See SKE Base Servs.*, 18-1 BCA ¶ 37,159 at 180,903.

As a matter of common sense, GSC (as noted) has undermined its credibility by blaming both its subcontractors *and* the government for the project delays and the termination for default. *Cf. Int'l Tech. Corp.*, ASBCA No. 54136, 2006 WL 3844163 at 3 (Dec. 20, 2006) ("a trier of fact, in the context of making witness credibility determinations, may believe or reject testimony in its entirety, or may believe parts of testimony and reject others"). *Cf. Morganti*, 49 Fed. Cl. at 134 (taking into account experts' contrary opinions but giving most weight to other evidence in the record, and drawing logical conclusions therefrom). In addition, when oral testimony is contradicted by contemporaneous documents the trier of fact should give little weight to the oral testimony. *See United States v. United States Gypsum Co.*, 333 U.S. 364, 395-96 (1947). Little weight is to be accorded to oral testimony that is contradicted by contemporaneous documents. *United States v. Int'l Bus. Mach. Corp.*, 66 F.R.D. 154, 159 (S.D.N.Y. 1974). *Cf. Wright Indus., Inc.*, ASBCA No. 18282, 78-2 BCA ¶ 13,396 at 64,477, 64,479 ("We give more weight to the contemporaneous records of the parties and particularly to the portion of the [Quality Deficiency Records] in which appellant's quality control personnel investigated its problems, ascertained the causes thereof and corrective action needed to eliminate the problems."); *James G. Davis Constr. Corp.*, ASBCA No. 58000, 15-1 BCA ¶ 35,818 at 175,158 ("we give great weight to the parties' contemporaneous words and conduct in attempting to resolve ambiguous provisions of a contract"); *Morganti*, 49 Fed. Cl. at 137 (stating that "[c]ontemporaneous evidence reveals that [contractor] conceded that timely cell-panel fabrication and installation were critical to keeping the project on schedule," and quoting contractor's internal memorandum, that "[c]ell panel delivery and erection through the 6th floor is this project's critical path"). On balance, GSC's contemporaneous admissions against interest are more credible than Mr. McAffee's opinion and GSC's current positions.

It may be asked:  How can so much in these appeals, which took ten days to hear, turn primarily upon only a relatively small body of evidence (that is, GSC's admissions against interest regarding the problems caused by its subcontractors)?  Something like this happened not too long ago:  in a unanimous, three-judge opinion, the Board found invoices upon which an appellant based its quantum case not credible, and on that basis alone unanimously denied the appeal without addressing appellant's entitlement argument (although the hearing of that appeal took only a little more than one day).  *TranLogistics LLC*, ASBCA Nos. 61366, 61450, 19-1 BCA ¶ 37,330 at 181,552-53.  In another set of appeals, we heard some five days of testimony regarding claims arising from a construction contract, and unanimously decided those appeals on the ground that the contract was void *ab initio*, without otherwise addressing any of the many entitlement and quantum issues raised by the parties, relying upon little more than two organizational charts and a single answer to a single question as the evidentiary basis for that decision.  *ABS Dev. Corp.*, ASBCA No. 60022 *et al.*, 19-1 BCA ¶ 37,234 at 181,232-23.  A tribunal need not discuss all the particular contentions in a case; when that happens, it does not mean that the tribunal did not consider all the parties' contentions in reaching its decision.  *Lowder v. Dep't of Homeland Security*, 504 F.3d 1378, 1383 (Fed. Cir. 2007).  All it means is that the author of the opinion, enjoying broad discretion to determine what the opinion should contain and in what detail, for whatever reasons did not find it necessary or appropriate specifically to discuss those points.  *See id.  Cf. Kellogg Brown & Root Servs., Inc. v. Sec'y of the Army*, 973 F.3d 1366, 1370 (Fed. Cir. 2020) ("We need not reach the issue of whether the government breached the contract by failing to provide adequate force protection because the Board did not err in concluding that KBR's claimed costs were not shown to be reasonable (a prerequisite to its requested relief)."); *Castle v. United States*, 301 F.3d 1328, 1341 (Fed. Cir. 2002) ("[W]e find that [the plaintiffs] have not established their entitlement to damages . . . .  Accordingly, . . .we expressly decline to consider the liability issue.").  *Tech. Sys., Inc.*, ASBCA No. 59577, 17-1 BCA ¶ 36,631 at 178,386 ("We need not address the argument of auditor independence because [appellant] has conceded it" (citing appellant's brief)); *Highland al Hujaz Co.,* ASBCA No. 58243, 16-1 BCA ¶ 36,336 at 177,167 n.11 ("Because we find that the government was justified in terminating the contract for default because appellant anticipatorily repudiated the contract, we need not and do not consider the government's alternative arguments."); *G.W. Galloway Co.*, ASBCA No. 17436 *et al.*, 77-2 BCA ¶ 12,640 at 61,295 ("We need not, and do not, reach this legal issue because appellant's claim fails on factual grounds in any event.").  In the context of Board opinions, that discretion presumably flows from one of the purposes of the Contract Disputes Act:  "to insure the independence of contract appeals board members as quasi-judicial officers."  *Freedom NY, Inc.*, ASBCA No. 43965, 05-1 BCA ¶ 32,934 at 163,121 (quoting S. REP. NO. 95-1118, at 13, 24, 26 (1978), *reprinted in* 1978 U.S.C.C.A.N. 5247, 5258, 5260); *Four-Phase Systems, Inc.*, ASBCA No. 26794, 84-2 BCA ¶ 17,416 at 86,746 (same);

*see also SWR, Inc.*, ASBCA No. 56708, 12-1 BCA ¶ 34,988 at 171,945 (Board functions in a judicial capacity).

GSC defaulted, and admitted that its subcontractors caused its default by delaying the work. Neither expert addressed those admissions or that issue, and neither expert's opinion is credible or helpful. GSC has failed to prove that its default was excused. I concur in the denial of ASBCA No. 59402.

## ASBCA NO. 59601: OVERHEAD COSTS

## FINDINGS OF FACT

On June 15, 2016, the Board ordered that the hearing of these appeals would be on entitlement and quantum. During the hearing, GSC predicted in its opening statement that it would "put on evidence that GSC's site overhead rate and cost build-up per day was $1,302" (tr. 1/29), and GSC's owner and president provided the following answers to the following questions (tr. 5/69-70):

> Q  That amount of $1,302.75, what is that?
>
> A  That is GSC going through its accounting software and the money that it spent on those activities that are listed there, on checks that were cut, to come up with a daily value on what GSC was spending per day on the SSA project.
>
> Q  These amounts, are they taken from your accounting books and records?
>
> A  Yes.
>
> Q  Are those records in order to obtain your bonding audited?
>
> A  Yes.
>
> Q  Okay. Are they -- is that amount true and correct to the best of your knowledge and belief?
>
> A  Yes, it is.
>
> Q  Okay. [T]hen you have the daily amount. You have the number of days. How did you calculate the claim amount?

A  The final amount is that you take the -- it's calculating in a calendar day -- and this is – then that's -- multiplied by that duration amount to come up with that overhead cost.

Q  And what is the total cost that's being claimed?

A  It's $328,293.82.

## DECISION

GSC says that it's entitled to $328,293.82 in field office overhead costs (it's term is "site overhead expenses") for 252 days of alleged delay at $1,302.75 per day (app. br. in ASBCA No. 59601 at 2).  As found above, GSC, through its subcontractors, delayed the work, causing the default and $4.5 million in losses to itself.  Consequently, GSC is not entitled to any recovery.

In addition, field office overhead costs, like other direct costs, require specific proof of the quantum of damages in addition to specific proof of proximate causation.  *See George Sollitt*, 64 Fed. Cl. at 242.  Even if it had demonstrated entitlement, GSC fails to demonstrate that it is entitled to any particular amount.  Despite eliciting the testimony quoted above regarding "[t]hat amount of $1,302.75," and despite having predicted in its opening statement that:  "[w]e'll put on evidence that GSC's site overhead and cost build-up per day was $1,302," in its post-hearing briefing GSC appears to say that the Board should order it "to submit cost and pricing data to determine the total amounts owed for its delay costs" (*id.* at 38).  In what it styles as a "Conclusion and Order," GSC adopts the voice of the Board (app. br. in ASBCA No. 59601 at 38 ), saying:

> GSC is entitled to 321 days of excusable delay for this appeal.  Of these 321 days, 258 compensable days.  GSC's Contract completion date should be December 21, 2014.  GSC is directed to submit costs and pricing data to determine the total amounts owed for its delay costs as it related to this appeal.

And GSC opens its brief by saying, without citation, "[o]nly entitlement is currently at issue in this appeal" (*id.* at 2).  Not so.  The parties had a year's notice that the hearing would address quantum.  Because in its post-hearing briefing GSC fails to develop any argument supporting the total amounts that it says it is owed for delay costs, it has failed to properly preserve that issue.  *See Omega Patents, LLC v. CalAmp Corp.*, 920 F.3d 1337, 1343 (Fed. Cir. 2019).  Looked at another way, again, the Board will not scour the record for GSC's evidence or do GSC's work for it, *see ESCgov, Inc.*,

78

ASBCA No. 58852, 17-1 BCA ¶ 36,772 at 179,189; *Highland al Hujaz*, 16-1 BCA ¶ 36,336 at 177,169-70; for that reason, too, GSC has failed to demonstrate its overhead costs. *See Parsons Evergreene, LLC v. Sec'y of Air Force*, 968 F.3d 1359, 1368 (Fed. Cir. 2020) ("Nothing in . . . [the authorities] cited by Parsons suggests that the Board was required to scour the tens of thousands of pages of record evidence in this case, without any guidance, to determine the amount of an award."). *See also Kellogg Brown & Root*, 973 F.3d at 1371 ("KBR only devotes two pages of its brief to defending the reasonableness of its costs and fails to describe in any detail KBR's cost calculation methodology or why its methodology was reasonable. This alone would justify affirmance, since KBR has not meaningfully briefed the issue.). *Cf. United States v. Great Am. Ins. Co. of N.Y.*, 738 F.3d 1320, 1328 (Fed. Cir. 2013) ("It is well established that arguments that are not appropriately developed in a party's briefing may be deemed waived."); *SmithKline Beecham*, 439 F.3d at 1320-21; *AAR Airlift Grp., Inc.*, ASBCA No. 59708, 19-1 BCA ¶ 37,462 at 182,007 (citing cases); *GSC Constr. Inc.*, ASBCA Nos. 59046, 59957, 19-1 BCA ¶ 37,393 at 181,797 ("Appellant requests $3,000 in claim preparation costs [], but presents no persuasive evidence in support of that very sparse claim. This portion of the appeal is denied."); *Cocoa Elec. Co.,* ASBCA No. 33921, 91-1 BCA ¶ 23,442 at 177,577 (denying claim for "failure to prove any damages"); *aff'd*, 64 F.3d 676 (Fed. Cir. Aug. 14, 1995) (table); *McCotter Motors, Inc.*, ASBCA Nos. 30498, 30997, 86-2 BCA ¶ 18,784 at 94,647 (declining to do appellant's work for it, and to do counsel's job: "The days of simply alleging every conceivable theory and leaving it up to the Board to search for facts and law to support the theories are over."); *Orlosky Inc. v. United States*, 68 Fed. Cl. 296, 318 (2005) (refusing to "undertake to prepare evidence"); *Al Ghanim Combined Grp. Co. Gen. Trad. & Cont. W.L.L. v. United States*, 67 Fed. Cl. 494, 498 (2005) ("This court cannot prepare evidence or speculate regarding its accuracy.").

Long ago we said:

> We are not charged with sorting through a haystack of documents to locate relevant facts. If we were to engage in such efforts it would cripple our ability to perform our basic function of providing a just, inexpensive and expeditious remedy. . . . In briefing we expect the parties to make specific reference to each remaining document which they contend supports their position. In the absence of such specific reference, parties risk documents not being considered in reaching our decision.

*Gary Aircraft Corp.*, ASBCA No. 21731, 91-3 BCA ¶ 24,122 at 120,718 (quoting *Hawaiian Dredging & Constr. Co.*, ASBCA No. 25594, 84-2 BCA ¶ 17,290 at 86,125); *accord Carolina Maint. Co.*, ASBCA No. 25891, 87-1 BCA ¶ 19,571 at 98,966 (in connection with the duty of counsel in respect to the contents of briefs);

*see also DANAC, Inc.*, ASBCA No. 33394, 97-2 BCA ¶ 29,184 at 145,150 ("in the absence of citation to specific passages, dates or report numbers, we have not accepted proposed findings supported only by such shotgun citations"). We also said, in a slightly different context:

> In sum, we have had virtually no aid and guidance in trying to determine appellant's entitlement in this appeal. There are seven volumes of transcript and the written record is about two feet tall. We are not inclined to comb through this record in search of support for appellant's claims which have been at best changing over time and totally unclear. *To do so would be to become appellant's advocate.* To be sure, we have looked at portions of the record in hopes of finding something to base our decision on. But, if we have missed important matters which support appellant's claim, appellant has only itself to blame.

*Essential Constr.*, 89-2 BCA ¶ 21,632 at 108,833-34 (emphasis added) (quoting *Hawaiian Dredging* and finding that "We have not been given the aid we need to sort through and find the merit, if any, in appellant's claim."); *see also VIZ Mfg Co.*, ASBCA No. 17787, 79-1 BCA ¶ 13,682 at 67,109 ("Many of [appellant's] claims were merely asserted in its briefs, with no support or inadequate support cited, as we found. While we do attempt a complete review of the record to cure this kind of inadequacy in appropriate circumstances, such as in small cases where appellants are appearing pro se, *we feel no such obligation in a case of this magnitude and complexity where the appellant is represented by counsel*" (emphasis added)). As for Mr. McKnight's bare testimony that GSC's claimed daily overhead rate of $1,302.75 consists of "GSC going through its accounting software and the money that it spent on those activities that are listed there, on checks that were cut, to come up with a daily value on what GSC was spending per day on the SSA project," that is far from what would be necessary for GSC to prove its quantum case.

I concur in the denial of ASBCA No. 59601.

Dated: November 24, 2020

_____
TIMOTHY P. MCILMAIL
Administrative Judge
Armed Services Board
of Contract Appeals

I certify that the foregoing is a true copy of the Opinion and Decision of the Armed Services Board of Contract Appeals in ASBCA Nos. 59402, 59601, Appeals of GSC Construction, Inc., rendered in conformance with the Board's Charter.

Dated: November 24, 2020

PAULLA K. GATES-LEWIS
Recorder, Armed Services
Board of Contract Appeals